## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNY HILL,

PLAINTIFF

Civil Action No. 05-160E

v.

Judge McLaughlin
Magistrate Judge Baxter

JOHN LAMANNA, ET AL.,
DEFENDANTS

Electronically Filed

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT, OR IN THE ALTERNATIVE, <u>FOR SUMMARY JUDGMENT</u>

AND NOW, come Defendants, John J. LaManna, Debora Forsyth, Marty Sapko, and Stephen Housler (hereinafter collectively referred to as "Defendants"), by their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Albert Schollaert, Assistant U.S. Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully move the Court to dismiss the Complaint filed by Plaintiff, Kenny Hill ("Plaintiff" or "Hill"), or, in the alternative, grant summary judgment in favor of the Defendants.

## I.   <u>INTRODUCTION</u>

Plaintiff Hill, a federal inmate, has brought a <u>pro se</u> action styled after the type recognized by the Supreme Court in <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971). Plaintiff's claims generally relate to alleged hazardous work conditions at his UNICOR job assignment at the Federal Correctional Institution, in McKean County, Pennsylvania ("FCI McKean"). As relief, Plaintiff seeks: (1) Seven million seventeen thousand dollars ($7,017,000.00) in compensatory and punitive damages; (2) reasonable

attorney's fees and costs; and (3) such other relief as the Court deems proper and just. <u>See</u> Complaint, page 10. For the reasons that follow, the Court should dismiss Plaintiff's Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

**II.**          **THE COMPLAINT**

This is one of six related cases currently pending before this court, and relating to the conditions in the UNICOR factory in FCI McKean.[1] Plaintiff filed this complaint on June 3, 2005.

In his first claim, Plaintiff alleges that, while he was incarcerated in FCI McKean, he was exposed to hazardous substances at his UNICOR work assignment. Plaintiff also alleges that he was not provided with adequate protective equipment. As a result of these conditions, Plaintiff alleges that he either did suffer serious medical conditions, or is at risk of developing serious medical conditions in the future. Plaintiff alleges that these conditions violated his Eighth Amendment right, Fifth Amendment Right to Due Process, and Fifth Amendment Right to Equal Protection. See Complaint ¶ 17.

In his second claim, Plaintiff alleges that Defendants altered the Material Safety Data Sheet for Micore board. He alleges that this violated Title 18 U.S.C. § 1001, as well as the Eighth and Fifth Amendments.

**III.**          **FACTUAL BACKGROUND**

---

[1] The other five related cases are: <u>Davila-Bajana v. Holohan</u>, 04-253; <u>Michael Hill v.LaManna</u>, 03-323; <u>Kelly v. Sapko</u>, 03-368; <u>Siggers v. LaManna</u>, 03-355; and <u>Ward v. LaManna</u>, 04-11.

A.    **Background**

Plaintiff is Kenny Hill, Register Number 17110-016, a Federal inmate, currently housed in the Federal Correctional Institution (FCI) Petersburg, Virginia.    He was convicted in the District Court for the District of Columbia of Unlawful Possession With Intent to Distribute Five or More Grams of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)B)(III); and Using and Carrying a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1).  He was sentenced to a total of 19 years on December 17, 1992.   His projected release date is January 3, 2017, via Good Conduct Time Release.  See Declaration of Douglas S. Goldring¶ 3, and Attachment A.

Plaintiff arrived at FCI McKean on April 6, 2001, and was first assigned to the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory on June 19, 2001.   On or around August 20, 2004, he was transferred to FCI Petersburg.  See Declaration of Martin Sapko ¶ 6, and Attachment B.

FPI is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities.  In order to achieve this goal, FPI operates factories in over 100 locations across the country.  It manufactures products and services in seven different business groups: Electronics, Clothing & Textiles, Fleet Management & Vehicular Components, Services, Office Furniture, Recycling, and  Industrial Products.  See Declaration of Martin Sapko ¶ 3.

Typically, each prison (with the exception of minimum security and administrative/ pretrial facilities) in the federal system contains one UNICOR factory which is a division of one of the above referenced business groups.  At all times relevant to this case, the FCI McKean

factory was part of the Office Furniture Business Group.   It is UNICOR's goal to employ a minimum of 25% of all eligible inmates incarcerated in the federal system.  See Declaration of Martin Sapko ¶ 4.

**B.     OSHA Inspection**

On July 3, 2001, the Area Director of the Occupational Safety and Health Administration ("OSHA") sent a letter to Stephen Housler, the Safety Manager at FCI McKean.  The letter advised  Housler that OSHA had received a notice of safety hazards regarding the ventilation system in the UNICOR factory at FCI McKean.  Specifically, the notice of safety hazards alleged that ventilation was inadequate,  employees were being exposed to excessive wood dust, and that dust masks were not readily available.  The letter indicated that OSHA had not made any determination that the alleged hazards existed, nor did OSHA intend to conduct an inspection at that time.  Nevertheless, since allegations of violations and/or hazards had been made, OSHA requested that FCI McKean investigate the alleged conditions and make any necessary corrections or modifications.  See Declaration of Stephen Housler ¶¶ 8-10, and Attachment A.

The Warden responded to OSHA's concerns on July 27, 2001.  In that letter, he described the dust collection system in the UNICOR factory and indicated that dust masks are available in the UNICOR tool room, and are issued upon request.  See Declaration of Stephen Housler ¶ 11, and Attachment B.

Specifically, the UNICOR factory at FCI McKean is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal. Each dust collector has the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory. See Declaration of Martin Sapko ¶ 7, and Attachment C.  The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.

According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first.  See Declaration of Martin Sapko ¶¶ 8-9.

Dust and air entering the dust collection system are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building.  The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building.  The filtered air is then returned to the factory though square ducts.  The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory.  See Declaration of Martin Sapko ¶ 10, and Attachments D and E.

On July 31, 2001, in response to the letter from OSHA, FCI McKean had Microbac Laboratories, Inc. conduct an indoor air quality survey of the FCI McKean UNICOR factory. Microbac tested six different sites in the factory, and all of the sites complied with the OSHA standard for total Particulates/Nuisance Dust.  See Declaration of Stephen Housler ¶ 12, and Attachment C.[2]

On April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean.  The OSHA Notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes.  The

---

[2]Indeed, the survey results showed that the air quality was well within OSHA standards. According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/ Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/ Respirable Nuisance Dust.  According the Microbac survey, the highest measurement for total particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter.  See Declaration of Stephen Housler ¶ 13, and Attachment C.

dusts included wood dust, particle board dust and Micoreboard dust.  The Notice also alleged that ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes.  See Declaration of Stephen Housler ¶¶ 14-15, and Attachment D.

On Wednesday, April 16, 2003, an OSHA compliance officer visited the FCI McKean UNICOR factory and conducted a walk-through inspection.  At the conclusion of the walk-through, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and necessary practices were being followed in accordance with OSHA regulations.  The inspector indicated that OSHA inspectors would return to the UNICOR factory to conduct a formal inspection.  See Declaration of Stephen Housler ¶ 16.

On May 14, 2003, the OSHA Compliance Officer conducted an inspection of the UNICOR factory.   On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct an air monitoring of the UNICOR factory.  On or about June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist told Defendant Housler that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory.  See Declaration of Stephen Housler ¶ 17.

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards. The letter included results of the OSHA air monitoring, which had evaluated worker exposures to airborne dust concentrations of vitreous fiber and perlite.  The results showed that no worker's exposure exceeded 10% of the relevant exposure limit.  See Declaration of Stephen Housler ¶ 18, and Attachment E.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of Unsafe or Unhealthful Working Conditions was issued. The only cited OSHA violation which is relevant to Plaintiff's complaints regarding hazardous substances in the UNICOR factory air was described as, "Adequate precautions against the ignition of flammable vapors were not taken." 29 C.F.R. § 1910.106(e)(6)(I). See Declaration of Stephen Housler ¶¶ 19-20, and Attachments F-G. The citation indicated the following:

> LokWeld 860/861 had a flash-point of approximately 15 degrees Fahrenheit and was applied to project items from a 5-gallon container with a roller. Mechanical exhaust ventilation in combination with the enclosures were not utilized to control the LokWeld's flammable vapors. Potential ignition sources in the area included but were not limited to the designated smoking area, woodworking machinery, and normal electrical systems. The smoking area was located within approximately 16 feet to 30-feet from the areas where the LokWeld was applied to the items.

Id.

Lokweld 860/861 ("Lokweld") is a spray grade adhesive used in the UNICOR factory at FCI McKean. Lokweld is applied to materials in the UNICOR factory using a sprayer which is located in an enclosed spraying booth, with its own independent exhaust system. See Declaration of Stephen Housler ¶ 21. The booth in which Lokweld is used is a completely enclosed unit. No leaks or other hazards have been identified. Furthermore, if a leak were to form, the vapors emanating from the booth would have a noxious and easily identifiable odor. There have been no reports or complaints of any unusual odors or vapors in or around the Lokweld spray station. See Declaration of Stephen Housler ¶ 22.

During the OSHA inspection of the UNICOR factory, which occurred from April 16, 2003 through August 1, 2003, OSHA personnel fully inspected the Lokweld spray booth. During

its inspection, OSHA did not note any concerns relating to Lokweld fumes emanating from the spray booth, ventilation of the Lokweld, or inmate protection against Lokweld fumes.  <u>See</u> Declaration of Stephen Housler ¶¶ 23-28, and Attachments E-G.

By letter dated September 22, 2003, Defendant LaManna informed OSHA that FCI McKean had taken corrective measures regarding all of the identified Unsafe Working Conditions, with four exceptions, which were awaiting additional information from the Bureau of Prisons Central Office.  Defendant LaManna's letter advised OSHA that by April 25, 2003, LokWeld glue and the fire cabinet had been removed from the Special Projects Area.  The Warden advised that LokWeld would no longer be used in making their products.  <u>See</u> Declaration of Stephen Housler ¶ 29-30, and Attachment H.


### III.    <u>LEGAL ARGUMENTS</u>

#### A.    <u>Standard for Summary Judgment</u>

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered "forthwith" if there is no genuine issue as to any "material fact."  In recent years there has been a dramatic change and much greater willingness of the courts to grant this remedy.  In 1986, the Supreme Court decided three cases which greatly liberalized summary judgment practice and encouraged a much greater use of summary judgment by trial courts.  <u>See</u> <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986); <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

> As stated by Chief Justice Rehnquist, summary judgment now:
> is properly regarded not as a disfavored procedural shortcut but rather as an
> integral part of the Federal Rules as a whole... Rule 56 must be construed with due
> regard not only for the rights of person asserting claims and defenses tried to a
> jury, but also for the rights of persons opposing such claims and defenses to

demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327. "Modern, post-trilogy summary judgment doctrine is a stronger and more aggressive approach to summary judgment practice that places a reduced burden on the movant, greater burdens on the nonmovant, and makes summary judgment more likely to be granted than the pre-trilogy approach." Moore's Fed. Prac., vol. 11, p. 56-312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually unsupported claims or defenses." Celotex, 477 U.S. at 323-324. The defendants have the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's case; and then the plaintiff has the burden to come forward with "specific facts" showing that there is a genuine issue for trial. LaBounty v. Coughlin, 137 F.3d 68, 73 (2nd Cir. 1998). The failure to sufficiently support all elements necessary to support a case will render all other facts immaterial. Celotex, 477 U.S. at 323.

The fact that a plaintiff has some facts on his side, or that there are some factual disputes, is not enough to deny the motion. The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; Matsushita Elec. Indus. Co., 475 U.S. at 586 (The motion will not be denied merely because of "some metaphysical doubt" about the material facts); Davidson v. Scully, 114 F.3d 12, 14 (2nd Cir. 1997)(The existence of "some" alleged factual dispute is not enough to defeat summary judgment, the opponent must show that there is no "genuine" issue of material fact"); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the motion); Sunshine Books Ltd. v. Temple University, 697 F.2d 90 (3d Cir. 1982)(The responding

9

party may not rest on the allegations of his/her pleading but must present by affidavit or

otherwise specific facts sufficient to create a genuine issue of material fact.  Fed.R.Civ.P. 56(e)).[3]

**B.    Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation**

Plaintiff's allegation that Defendants violated his Eighth Amendment rights by allegedly

exposing him to environmental hazards must be dismissed because it is clear that Plaintiff has

satisfied neither the objective nor subjective prongs of the Eighth Amendment test.  Farmer v.

Brennan, 511 U.S. 825 (1994) and Helling v. McKinney, 509 U.S. 25, 33-34 (1993).

**1.    The Eighth Amendment Standard**

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that a cause of

action exists under the Eighth Amendment when a prisoner alleges that prison officials have

exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS")

--------------------------------

[3] In the alternative, Defendants also seek dismissal of the complaint pursuant to Fed. R. Civ. Pro. 12(b)(6).  In a Rule 12(b)(6) Motion to Dismiss, the complaint is liberally construed, and all well-pleaded fact allegations, and any reasonable inferences to be drawn from the facts alleged, viewed in the light most favorable to the non-moving party.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1384 (3d Cir. 1994). This concession of truth, however, goes only to well-pleaded fact allegations, not legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See Mires v. Dekalb County, Ga., 433 U.S. 25, 27 n. 2 (1977); Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993); Davidson v. State of Ga., 622 F.2d 895 (5th Cir. 1980); Wilson v. Lincoln Redevelopment Corp., 488 F.2d 339 (8th Cir. 1973); Stanturf v. Sipes, 335 F.2d 224 (8th Cir.), cert. denied, 379 U.S. 977 (1965); Violenti v. Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1255 (M.D. Pa. 1994).

Moreover, the claimant must set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.  See Fed. R. Civ. Pro. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-6 (1957).

In short, the court must dissect the complaint, eliminate mere rhetoric, legal conclusions and unsupported factual conclusions, and determine whether or not well-pleaded fact allegations, when construed in a light more favorable to the Plaintiff, state a factual claim on some legal theory upon which relief can be granted, but not whether a plaintiff will ultimately prevail on that claim.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

that pose an unreasonable risk of harm to his future health. Id. at 35. In Helling, the Court

established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth

Amendment. The first prong is objective. The Plaintiff must show that "he himself is being

exposed to unreasonably high levels of ETS." Id. at 35 (emphasis added). With respect to this

prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry

into the seriousness of the potential harm and the likelihood that such injury to health will

actually be caused by exposure to the contaminant, but also "to assess whether society considers

the risk that the prisoner complains of to be so grave that it violates contemporary standards of

decency to expose anyone unwillingly to such a risk." Id. at 36 (emphasis in original).

The second prong is a subjective one: a plaintiff must show that prison officials were

deliberately indifferent to a serious risk of harm. Id. The Supreme Court has held that:

> a prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts for which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In this case, Plaintiff alleges that he was exposed to Micore Board fibers, sawdust, and

Lokweld adhesive without appropriate ventilation and/or protective gear. However, the evidence

presented by Plaintiff with respect to this claim fails to establish either prong of the Helling test,

because Plaintiff cannot show that he was exposed to "unreasonably high" levels of air pollution

or toxins, or that Defendants exhibited deliberate indifference to such exposure.

### 2.    Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances

With respect to the first prong of the Eighth Amendment analysis, Plaintiff cannot show

11

that he was exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency. Although Defendants agree that crystalline silica, an ingredient in Micore Boards, is classified as a human carcinogen, respirable silica was <u>not</u> detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors. <u>See</u> Declaration of Stephen Housler ¶¶ 12-13 and 18, Attachments C and E. Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit. <u>See</u> Declaration of Stephen Housler ¶ 18, Attachment E. Thus, OSHA determined that Plaintiff and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory. Plaintiff simply cannot, in this case, "show that he himself is being exposed to unreasonably high levels of" harmful substances, as required by <u>Helling</u>, where the UNICOR facility is in compliance with the relevant federal air quality standards.

Additionally, in the Complaint, Plaintiff alleges that Defendants' failure to provide him with a NIOSH-approved respirator also constituted a violation of his Eighth Amendment rights. The Micore Fiber MSDS sheet clearly discusses the circumstances under which a NIOSH-approved respirator should be used. Section VIII of the MSDS indicates that special respiratory protection is "not typically necessary under normal conditions of use." <u>See</u> Declaration of Stephen Housler ¶ 32, and Attachment I. A NIOSH-approved respirator is necessary only "in poorly ventilated areas, if TLV is exceeded and/or when dusty conditions exist." <u>See</u> Declaration of Stephen Housler ¶¶ 34-35, and Attachments C, E and I.[4] Here, however, Defendants'

---

[4] The same is true for sawdust which Plaintiff alleges was in the air as a result of the work being conducted on particle board. A review of the MSDS sheet for Temple-Inland Particle board, however, indicates that this product is perfectly safe, as long as the area is properly ventilated. Again, the factory is extremely well ventilated, and no concerns with the ventilation

evidence establishes that Plaintiff was exposed only to air that comported with federal guidelines, was not poorly ventilated or unusually dusty, and that any American might be exposed to on a daily basis in the course of his or her job. See Declaration of Stephen Housler ¶¶ 18 and 35, and Attachments C, E and I; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E. Based upon the tests and inspections conducted by the OSHA inspectors, the conditions in the UNICOR factory did not require the Defendants to take any other precautions with respect to the use and processing of Micore Board. See Declaration of Stephen Housler ¶¶ 18 and 32-34, and Attachments C, E and I. Although several suggestions were made to increase the safety measures available to personnel assigned to the UNICOR factory, these were recommendations only, and OSHA fully recognized that levels of contaminants in the UNICOR factory were well within the applicable guidelines. See Declaration of Stephen Housler ¶ 18, and Attachment E.

Because the respiratory exposure level for dangerous contaminants amounted to a mere 10% of the relevant exposure limit, and BOP did not violate requirements regarding safety precautions, the risk to Plaintiff simply cannot amount to a level so grave that it violates contemporary standards of decency as required under the Helling test. OSHA standards reflect contemporary standards of decency – our society willingly exposes free citizens and inmates alike to toxins, chemicals, and particulates up to the threshold values established by OSHA. See, e.g., Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005); Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The conditions present in the UNICOR building did not violate OSHA standards. As such, Plaintiff

system have ever been noted by OSHA inspectors. The MSDS does not recommend the use of a respirator when working with this product. See Declaration of Stephen Housler ¶ 46, and Attachment K; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.

cannot establish the objective prong of the Eighth Amendment test, and his Eighth Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards. The United States District Court for the Western District of New York recently addressed a § 1983 claim by *pro se* prisoners that New York state correctional officials had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments. See Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005). The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems. See id. at *1. In support of their claims, plaintiffs submitted a report by an OSHA specialist that he had concerns regarding the ability of the ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working environment. See id. The OSHA specialist had not taken air quality samples. An industrial hygienist associated with the state department of corrections later conducted air quality tests to determine whether employees were being exposed to hazardous chemicals at levels that exceeded state guidelines. Id. at *2. The air quality tests confirmed that the substances tested were below the permissible levels set by the state. Id. Based on the air quality tests, the correctional officials determined that the air quality in the print shop did not pose an unreasonable risk to inmate employees' health. Id.

The Wooten Court agreed with the correctional officials' decision and granted summary

14

judgment in their favor. The Court concluded that plaintiffs had not shown that the allegedly

poor ventilation in the print shop was serious enough to satisfy the objective element of their

Eighth Amendment claim. Id. at *5. The Court acknowledged that plaintiffs' evidence had

shown that OSHA had made recommendations for improvements to the print shop air quality.

Id. However, plaintiffs' evidence did not show that the air quality failed to comply with federal

workplace safety standards. Id. Moreover, defendants' evidence regarding air quality indicated

that print shop workers were not being "excessively exposed to hazardous materials." Id.

Finally, plaintiffs had not offered evidence to show that defendants' air quality tests were

erroneous or unreliable. Id. Accordingly, plaintiffs failed to raise a triable issue of fact with

respect to the objective element of their Eighth Amendment claim. See also Saahir v. Holligan,

2004 WL 1418790 (N.D. Tex., June 24, 2004)(granting summary judgment to state prison

officials in § 1983 Eighth Amendment claim by asthmatic inmate who alleged his work

assignment in boot factory exposed him to hazardous chemicals, dust, and glue fumes.

Defendants were entitled to summary judgment based on fact that boot factory had been

inspected and air quality met OSHA standards).

     Similarly, the United States District Court for the District of Delaware granted summary

judgment in favor of state correctional officials on an inmate's claim that he was exposed to

unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth

Amendment rights. See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002). In

Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky"

conditions, as well as a chart detailing the time of day and the number of inmates smoking at any

given time over the course of a five-day period. Id. He also produced affidavits from several

other inmates in support of his claims. Id. The Baker Court granted summary judgment in

favor of defendant prison officials because, even if plaintiff had shown that he was subject to some level environmental tobacco smoke, he had not "provid[ed] competent evidence as to the level of such ETS." Id. Accordingly, the Court found that the inmate failed to meet the Supreme Court's requirement in Helling that he show his exposure to a toxin "created a risk [that] is so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. (quoting Helling, 509 U.S. at 36). See also Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's Eighth Amendment claim where plaintiff inmate could not show that he himself was being exposed to "unreasonably high levels" of environmental tobacco smoke, because the institution had an "open air only" smoking policy). Here, like the inmate in Baker, Plaintiff Ward cannot show that he was exposed to a level of air pollution, dust, or toxins that created a risk so grave as to violate contemporary standards of decency. To the contrary, Defendants have come forward with conclusive evidence establishing that the UNICOR factory certainly did not expose Plaintiff to that kind of risk. See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

Courts have granted summary judgment in favor of prison officials even where the correctional facility is not in compliance with applicable federal standards. In Carroll v. DeTella, 255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment claim that the prison drinking water was contaminated with radium. There, it was undisputed that the radium levels in the drinking water of the correctional facility did exceed the maximum level set by the United States Environmental Protection Agency ("EPA"). See id. at 472. However, despite the fact that the correctional facility's radium level continued to exceed the federal maximum, the state environmental agency informed the plaintiff-inmate that other

16

communities in Illinois had water supplies that also exceeded the federal maximum. Plaintiff was also informed that no remedial action would be taken to address radium levels, because the EPA was considering raising the maximum level. However, at the time plaintiff filed suit, the EPA had not raised the radium standard, and the plaintiff continued to be subject to radium levels that violated the applicable federal standards. Nonetheless, the Seventh Circuit affirmed the District Court's grant of summary judgment in favor of prison officials.

In granting summary judgment, the Carroll Court recognized that prisons are not under a duty to provide a maximally safe environment, completely free from pollution or safety hazards. Id. Because many Americans live under conditions of exposure to various contaminants, the Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." Id. (internal citations omitted). As the Court recognized,

> It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures. If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

Id. at 472-73.

Here, Plaintiff Hill is being exposed to air quality and working conditions that OSHA, and our society, deems to be entirely acceptable for all persons, whether free or incarcerated. Because Plaintiff simply cannot show that he was subjected to "unreasonably high" levels of air pollutants, he has failed the objective portion of the Helling Eighth Amendment test, and summary judgment must be entered in favor of Defendants.

17

### 3.    Plaintiff Cannot Establish Deliberate Indifference on the Part of Prison Officials[5]

Even assuming that Plaintiff had satisfied the objective portion of the Eighth Amendment

test, which he has not, he cannot show deliberate indifference on the part of prison officials, as

required by the subjective portion of the Helling test.  As discussed in section 2, supra,

Defendants' compliance with OSHA standards clearly insulates them from liability.  See Helling

v. McKinney, 509 U.S. 25 (1993); Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25,

2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005);  Saahir v. Holligan, 2004 WL 1418790

(N.D. Tex., June 24, 2004);  Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002);

Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001).  Furthermore, even assuming,

arguendo, that Defendants' compliance with OSHA standards is not enough, Defendants

---

[5] Pursuant to the Prison Litigation Reform Act, Pub.L.No. 104-134, 110 Stat. 1321 (April 26, 1996) (PLRA) "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a **prior showing of physical injury**." PLRA, 42 U.S.C. § 1997e(e)(emphasis added). Mitchell v. Horn, 318 F.3d 523, 533-36 (3d Cir. 2003); Davis v. District of Columbia, 158 F. 3d 1342 (D.C. Cir. 1998); Zehner v. Trigg, 133 F. 3d 459 (7th Cir. 1997).

It is well settled that fear of a future medical condition does not constitute a physical injury for purposes of the PLRA.  See Fontroy v. Owens, 150 F.3d 239, 243 (3d Cir. 1998); Herman v. Holiday, 238 F.3d 660, 665-66 (5th Cir. 2003)(§ 1997e(e) bars claims for mental and emotional damages caused by the fear that one's exposure to environmental hazards may result in exposure related diseases).

Additionally, during the periods of time in which Plaintiff was assigned to the UNICOR factory, , he neither reported  any work-related health problems, nor did his medical records indicate that he suffered from any work related health problems or injuries.  See  Declaration of Douglas S. Goldring ¶ 5, and Attachment C; Declaration of Stephen Housler ¶¶ 47-48; Declaration of Martin Sapko¶ 11; Declaration of Debora Forsyth ¶ 8.

Therefore, his Eighth Amendment claim relating to exposure to environmental hazards must be dismissed pursuant to the PLRA, 42 U.S.C. § 1997e(e).

respectfully assert that they did evaluate, and comply with, the Material Safety Data Sheets for substances utilized in the UNICOR factory.

Courts have established that, with respect to the subjective prong of the Eighth Amendment analysis, Defendants are not deliberately indifferent to plaintiffs' health where they conduct air quality testing and results comply with federal standards. In Carroll, the Seventh Circuit stated that even if inmate print shop employees had met the objective portion of their burden, they could not satisfy the subjective element despite the fact that defendants were on notice that the ventilation system may have needed improvements. See 2004 WL 816919, at *5. "Any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards." Id. at *5.

Here, as in Carroll, OSHA conducted air quality tests and concluded that the air quality in the UNICOR factory was well within applicable acceptable guidelines for the relevant contaminants. See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E. It was thus reasonable for FCI McKean to rely on available air quality test results to determine what, if any, safety equipment it needed to make available for staff and inmates assigned to the UNICOR factory. There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded, an excessive and serious risk to Plaintiff Hill's health. The Court may not hold Defendants to a higher standard than that required by federal agencies who are charged with monitoring workplace safety. Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted

19

consistently with, the applicable MSDS sheets and product warning labels in determining what protective equipment to provide for UNICOR employees. MSDS sheets are required to, and do, list risks associated with overexposure to various chemicals. More importantly, however, the MSDS sheets set forth what precautions, if any, must be taken in order to protect against such risks. See Declaration of Stephen Housler ¶ 33. Defendants' decisions regarding the UNICOR work environment and protective equipment were consistent with the MSDS sheets and with product warning labels. See Exhibit 2 ¶¶ 32-38, and Attachment C, E, I, and J.

The product warning label for Micore Board states: "Dust hazard. Cut and trim with knife, razor, or hand saw. Do not cut with power equipment unless a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn." See Declaration of Stephen Housler ¶ 38, and Attachment J. Defendants do not dispute that power equipment was used to cut Micore Board. However, in accordance with the Micore 300 label, the UNICOR factory employed a dust collector on the cutting equipment. See Declaration of Stephen Housler ¶ 36; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E. Because the UNICOR factory used a dust-collector system instead of local exhaust, a NIOSH/MSHA-approved mask was not required. See Declaration of Stephen Housler ¶¶ 34-38, and Attachments I-J.

The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-approved masks are not required when a dust collecting system is in use.[6] See Declaration of

---

[6]Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of chemicals they produce or import. Using that information, they must prepare labels for containers, and the more detailed MSDS technical bulletins. Chemical manufacturers, importers and distributors of hazardous chemicals are required to provide the appropriate labels and MSDS to the employer to which they ship the chemicals. 29 C.F.R. §1910.1200, App. E. See Declaration of Stephen Housler ¶

Stephen Housler ¶¶ 32-35, and Attachment C, E, and I.  An MSDS is a technical bulletin prepared by chemical manufacturers and importers to supplement the information contained on product labels. 29 C.F.R. § 1910.1200, App. E.  Pursuant to OSHA regulations, employers may rely on the information contained on the product labels, as supplemented by the MSDS, and have no independent duty to analyze the chemical or evaluate the hazards of it.  See Declaration of Stephen Housler ¶ 33.

Section VII of the MSDS for Micore Board provides:

**Respiratory protection:** Not typically necessary under normal conditions of use. Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold Limit Values)]  requirements of individual ingredients and to control dusting conditions.  Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated areas, if TLV is exceeded, and/or when dusty conditions exist.  Avoid prolonged and repeated breathing of dust.

See Declaration of Stephen Housler ¶ 32, and Attachment I.

Thus, according to the MSDS for Micore Board, there are three situations which would necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist.  See Declaration of Stephen Housler ¶ 35, and Attachment I.  However, the air quality tests performed by OSHA in the UNICOR factory definitively establish that the UNICOR factory was not poorly-ventilated, that the Threshold Limit Values for hazardous ingredients of Micore Board were not exceeded, and that dusty conditions did not exist.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E. Indeed, the evidence shows that air quality tests conducted in 2001 and 2003, by Microbac Laboratories and by OSHA, respectively, revealed that the respiratory particulates were well below applicable OSHA limits.  See Declaration of Stephen Housler ¶¶ 33.

12-13, 18, and Attachments C and E.   More specifically, with respect to the level of dust in the

UNICOR factory, the objective air quality tests show that the total particulate level was 1.1 mg

per cubic meter, which is well below the applicable TLV standard for total Particulates/Nuisance

Dust – 15 mg per cubic meter.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and

Attachments C and E.

It is also clear that the UNICOR factory at FCI McKean was more than adequately

ventilated.  Specifically, the factory is equipped with two dust collection systems, each consisting

of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust

collectors have been operational in the FCI McKean UNICOR factory since approximately

September 11, 1989, and each dust collector has the capacity to move 34,000 cubic feet of air per

minute from the UNICOR factory.  See Declaration of Martin Sapko ¶7, and Attachment C.

The dust collection system is connected to the furniture-manufacturing machinery in the

UNICOR building.  According to operational procedures in the UNICOR factory at FCI

McKean, the manufacturing machinery is not to be operated unless the dust collection system is

turned on first.[7]  See Declaration of Martin Sapko ¶8.

---

[7] Micore Board is initially cut to size on the SCMI Horizontal Beam Panel Saw. This
machine has two dust collection connections: (1) a six inch port connected to the bottom and (2)
a five inch port connected to the top portion of the machine.  Each of these connections provides
dust collection to the saw blade at the point of machining.  In the next step of the process, the
four edges of the Micore Board are shaped on the Delta Shaper machine.  This machine has one
four inch port connected to the shaper fence, which supplies dust collection directly at the point
of machining.  In the third and final machining operation, the Onsrud Inverted Router is used to
create a pocket in the back side of the Micore Board for support brackets.  This operation is only
performed on half of the quantity ordered.  This machine has a six inch port connected to the
bottom supplying dust collection directly to the point of machining and a four inch port
connected to a hood located directly over the point of machining to supply dust collection for
particles, if any, that are not collected from the bottom.  All of the aforementioned machines are
connected to the main dust collection plenum leading to one of the two main dust collection
systems.  See Declaration of Martin Sapko ¶9.

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary. That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation... Do not cut with power equipment unless <u>either</u> a dust collector is used on the equipment <u>or</u> local exhaust is used and NIOSH/MSHA-approved respirator is worn." <u>See</u> Declaration of Stephen Housler ¶¶ 32-37, and Attachment I. This language is similar, but not the same as, the warning contained on the Micore Board product label. The use and placement of the words <u>either</u> and <u>or</u> in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators. Defendants reasonably opted to employ a dust collector system. <u>See</u> Declaration of Stephen Housler ¶ 38, and Attachment J; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E. The MSDS does not indicate that, where a dust collector is used on the equipment, NIOSH-approved respirators are also required. <u>See</u> Declaration of Stephen Housler¶¶ 32-37, and Attachment I. Defendants' interpretation of the applicable safety requirements for Micore Board is consistent with the findings of the OSHA inspectors, who recommended, <u>but did not require</u>, the use of NIOSH-approved respirators. <u>See</u> Declaration of Stephen Housler ¶ 18, and Attachment E.

---

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above, are actually smooth on the inside for better dust collection. The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building. The filtered air is then returned to the factory though square ducts. The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. <u>See</u> Declaration of Martin Sapko ¶10, and Attachments D-E.

With respect to Plaintiff's claims regarding exposure to Lokweld, a spray-grade adhesive that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is only required "in case of insufficient ventilation." See Declaration of Stephen Housler, Attachment G. Lokweld is applied to materials in the UNICOR factory using a sprayer, which is located in an enclosed spraying booth with an independent exhaust system. See Declaration of Stephen Housler ¶ 21. The booth in which Lokweld is used is completely enclosed, and no leaks or other hazards have been identified relating to Lokweld. See Declaration of Stephen Housler ¶ 22. Had a leak developed, vapors emanating from the booth would have had a noxious and easily identifiable odor. See Declaration of Stephen Housler ¶ 22. FCI McKean has not received any complaints about odors in or around the Lokweld station, nor has the Safety Manager ever noticed any unusual odors in the area. See Declaration of Stephen Housler ¶ 22.

Moreover, when OSHA inspected the UNICOR factory between April and August of 2003, they fully inspected the Lokweld spray booth. See Declaration of Stephen Housler ¶ 23. The OSHA inspectors did not reveal any concerns relating to any Lokweld fumes emanating from the spray booth. See Declaration of Stephen Housler ¶¶ 24-25, and Attachment F. The only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory. See Declaration of Stephen Housler ¶¶ 24-27, and Attachment F. FCI McKean corrected each of OSHA's concerns relating to Lokweld by September 22, 2003. See Declaration of Stephen Housler ¶ 29, and Attachment H. Accordingly, Plaintiff's concerns about Lokweld are contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, and the Declaration of Safety Manager Housler, each of which indicates that Lokweld fumes were not

24

emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

In conclusion, Defendants properly relied on objective air quality data, the results of the OSHA inspection of the UNICOR factory, and the relevant MSDS sheets in making decisions regarding UNICOR factory conditions and necessary protective equipment. They were in no way deliberately indifferent to Plaintiff's health and safety in relying on this objective, federally sanctioned information, and Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.[8]

**C.     To the Extent Plaintiff States a Claim Pursuant to the Fifth Amendment Substantive Due Process Clause, it is Foreclosed by the Eighth Amendment Claim.**

Plaintiff, in his Complaint, summarily alleges that his allegations violated his, "right to be free of deprivations of liberty without due process." See Complaint ¶¶ 17-18. It is well settled that if a constitutional claim is covered by a specific constitutional provision, it must be analyzed

---

[8] Plaintiff further alleges that Defendants violated his Fifth and Eighth Amendment rights by altering the Material Safety Data Sheet (MSDS) for Micore Fiber. See Complaint ¶ 18. Even if this allegation could satisfy Fifth or Eighth Amendment standards, Plaintiff has provided no evidence that he was actually harmed by the alleged alteration to the MSDS sheet. Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one. See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler¶¶ 32-46; Declaration of Debora Forsyth ¶ 8. An unauthorized marking or alteration which was allegedly made on the MSDS sheet, and never noticed by any staff member at the time, played no part in this calculus. See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler¶¶ 32-46; Declaration of Debora Forsyth ¶ 8. Finally, because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet. Such handwritten alterations to an MSDS sheet are not authorized by Defendant Housler or anyone else in the institution. See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler¶¶ 43-45; Declaration of Debora Forsyth ¶ 9. Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable. See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler¶¶ 43-45; Declaration of Debora Forsyth ¶ 9.

under the standard appropriate to that specific provision, not under the rubric of substantive due

process. See U.S. v. Lanier, 520 U.S. 259, 272 n.7 (1997).  Any substantive due process claim

raised by Plaintiff as a result of his alleged exposure to silica dust relates to a specific

government behavior against which the Eighth Amendment explicitly protects.  Helling v.

McKinney, 509 U.S. 25 (1993).  As such, Plaintiff cannot obtain relief pursuant to the Fifth

Amendment Substantive Due Process Clause, and this claim must be dismissed with prejudice.[9]


### D.    Plaintiff Fails to State An Equal Protection Claim

Defendants respectfully assert that Plaintiff has failed to state a claim for any violation of

his right to equal protection under the law.  As such, this claim must be dismissed.

Although the Fifth Amendment to the United States Constitution contains no equal

protection clause, "'the Fifth Amendment's Due Process Clause prohibits the Federal

Government from engaging in discrimination that is so unjustifiable as to be violative of due

process.'"  Abdul-Akbar v. McKelvie, 239 F.3d 307, 316 (3d Cir. 2001)(en banc), cert. denied,

533 U.S. 953 (2001)(quoting Schlesinger v. Ballard, 419 U.S. 498, 500 n.3 (1975)).

Accordingly, the Supreme Court has construed the Fifth Amendment to contain an equal

protection guarantee.  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 616 (1991); Abdul-

---

[9] To the extent Plaintiff's Complaint states a Procedural Due Process claim, that claim is clearly without merit.  In order to establish a procedural due process claim, Plaintiff must demonstrate that he was deprived of a constitutionally-protected property or liberty interest. Daniels v. Williams, 474 U.S. 327, 339 (1986); Sandin v. Connor, 515 U.S. 472 (1995). Additionally, in order to state a due process claim, Plaintiff must be able to further show that he was denied an opportunity to be heard with regard to the conditions to which he was exposed.  Id. In his complaint, however, Plaintiff acknowledges that he exhausted the administrative remedy process that was made available to him with regard to the conditions in the UNICOR factory. See Complaint ¶7.  See also 28 C.F.R. § 542.10, et seq.  As a result, Plaintiff cannot support a claim that he was deprived of the procedural protections of the Due Process Clause.

Akbar, 239 F.3d at 316-17. Courts examine Fifth Amendment equal protection claims under the same principles that apply to such claims under the Fourteenth Amendment. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 217 (1995); Abdul-Akbar, 239 F.3d at 317.

The equal protection clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. States, and the federal government via the Fifth Amendment, must therefore treat like cases alike, but may treat unlike cases accordingly. Plyler v. Doe, 457 U.S. 202, 216 (1982). Statutes or regulations that substantially burden a fundamental right or target a suspect class are subject to "strict scrutiny," and will be deemed constitutional only if they are narrowly tailored to serve a compelling state interest. Plyler, 457 U.S. at 216-17; Abdul-Akbar, 239 F.3d at 317. Conversely, a legislative classification or distinction that neither burdens a fundamental right nor targets a suspect class is constitutional so long as it bears a rational relation to some legitimate end. Romer v. Evans, 517 U.S. 620, 631 (1996); Abdul-Akbar, 239 F.3d at 317.

In his Complaint, Plaintiff does not assert that any of his fundamental rights have been violated, nor could he succeed in making such a showing. A fundamental right, for purposes of equal protection analysis, is one that is "among the rights and liberties protected by the Constitution." San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 29 (1973). As stated above, inmate work assignments do not implicate a protected liberty or property interest. See James v. Quinlan, 866 F.2d 627 (3d Cir.), cert. denied, 493 U.S. 870 (1989); Garza v. Miller, supra. See Sandin v. Conner, supra. Plaintiff has no constitutional right to a particular work assignment, let alone a constitutional right to a respirator. Accordingly, no fundamental right is at stake for purposes of equal protection analysis.

Nor has Plaintiff asserted that the basis of the alleged unequal treatment was his

membership in a suspect class for purposes of equal protection analysis. Prisoners as a group do not constitute a suspect class for purposes of equal protection analysis. Abdul-Akbar, 239 F.3d at 317 (citing Pryor v. Brennan, 914 F.2d 921, 923 (7th Cir. 1990)). Because Plaintiff is not a member of a suspect class and no fundamental right is at stake, strict scrutiny is not the appropriate test. The Court must evaluate his equal protection claim under rational basis review.

In order to bring a successful claim for a denial of equal protection when the plaintiff does not allege membership in a suspect class or substantial interference with a fundamental right, a plaintiff must show that he has been intentionally treated differently from others similarly situated to him and that there is no rational basis for the difference in treatment. See, e.g. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Little v. Terhune, 200 F. Supp.2d 445, 450 (D.N.J. 2002). Absent allegations of a discriminatory classification, no two prisoners may ever be regarded as similarly-situated in the context of "discretionary, individualized decisions." Rowe v. Cuyler, 534 F.Supp. 297, 301 (E.D.Pa. 1982), aff'd, 696 F.2d 985 (3d Cir. 1982); Johnson v. Paparozzi, 219 F.Supp.2d 635, 644 (D.NJ 2002) (dismissing prisoner's equal protection claim for failure to state a claim upon which relief can be granted and quoting Rowe); Bagwell v. Brewington-Carr, 2000 WL 1728148, at *19 (D.Del 2000)(granting summary judgment in favor of prison officials and quoting Rowe), aff'd., 33 Fed.Appx. 647, 2002 WL 885058 (3d Cir. 2002); Adams v. McAllister, 798 F.Supp. 242, 246 (M.D.Pa. 1992), aff'd., 972 F.2d 1330 (3d Cir. 1992); Jubilee v. Horn, 975 F.Supp. 761, 767 (E.D.Pa. 1997), aff'd., 151 F.3d 1025 (3d Cir. 1998). See also, Jauregui v. Forth, 1992 WL 309619, at *3, No. 89 C 0519 (N.D.Ill. October 19, 1992).

Assuming, arguendo, that two prisoners can be similarly situated for purposes of equal protection analysis, Plaintiff has failed to allege that he is similarly-situated to, or that he has

been treated differently than, any other inmate in the UNICOR factory. In fact, aside from simply mentioning the name of the Equal Protection Clause in his Complaint, Plaintiff fails to allege any facts or circumstances in the Complaint which could be construed as discriminatory in any way. Therefore, his equal protection claim must be dismissed for failure to state a claim upon which relief can be granted.[10]

### E. THE ALLEGED VIOLATION OF CRIMINAL STATUTE 18 U.S.C. 1001(a) DOES NOT CREATE A PRIVATE RIGHT OF ACTION.

In Plaintiff's Second Claim, he alleges that Defendants LaManna, Forsyth, Sapko and Housler violated his Constitutional rights, because the Materials Safety Data Sheet (MSDS) for Micore-Board or Spec-Board was altered so that the word "respirator" was marked out and the word "mask" was written in. He alleges that the alleged alteration of the MSDS violated 18 U.S.C. § 1001(a), a criminal statute which criminalizes the falsification of a material fact. This claim should be dismissed, because 18 U.S.C. § 1001(a) does not create a private right of action.

In his claim, Plaintiff, in conclusory fashion, attributes the alteration of the MSDS to "the Defendants," but provides no allegations explaining how the named defendants were involved in this alleged act, nor does he show that any of the defendants were convicted for violation of 18 U.S.C. § 1001(a).

---

[10] Plaintiff also mention the Privileges and Immunities Clause of the Fifth Amendment. See Complaint ¶¶ 17-18. It is clear, however, that the purpose of that clause was to protect against discrimination based upon residency. United Building and Construction Trade Council of Camden County v. Mayor and Council of the City of Camden, 465 U.S. 208 (1984). In other words, the clause protects against, "discrimination against out-of-state residents on matters of fundamental concern." Id. Clearly, this clause has no basis in the present litigation.

To state an actionable claim under <u>Bivens,</u> a plaintiff must plead specific facts to support a constitutional violation. <u>See</u> <u>e.g.,</u> <u>Barbera v. Smith</u>, 836 F.2d 96, 99 (2d Cir. 1987), <u>cert.</u> <u>denied</u>, 489 U.S. 1065 (1989). The specificity requirement prevents vague and conclusory allegations from becoming the basis for a lawsuit. <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 808, 817-818 (1982).

Here, Plaintiff has alleged no facts sufficient to show a violation of 18 U.S.C. § 1001(a). Moreover, 18 U.S.C. § 1001(a) does not confer a private right of civil action. <u>Weiss v. Sawyer</u>, 28 F.Supp.2d 1221, 1227 (W.D.Ok 1997)(holding that alleged violation of 18 U.S.C. § 1001 does not create a private right of action).

Therefore, because 18 U.S.C. § 1001(a) is a criminal statute that does not create a private right of civil action upon a private citizen, Plaintiff's Second Claim should be dismissed.

**F.    Defendant LaManna Must Be Dismissed From This Action Because Plaintiff Has Plead No Claims Against Him And, Therefore, Can Show No Personal Involvement.**

In order to state a viable civil rights claim, a plaintiff must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of law; and 2) that said conduct deprived the Plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 638 (3d Cir. 1995); <u>Shaw by Strain v. Stackhouse</u>, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

An inmate must plead and later prove that some affirmative act or omission was committed by the individual Defendant to submit him to personal liability for the actions of another person. <u>Bracey v. Grenoble</u>, 494 F.2d 566 (3d Cir. 1974). Indeed, complaints combining conclusory allegations, absent reference to material facts, will not survive motions to

dismiss. Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988). See also Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins, 795 F.2d 900 (10th Cir. 1986); Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(a Plaintiff attempting to present a civil action against individual government officials must be able to present material facts on which he contends he can establish a right to recovery, such a Plaintiff should also be able to state those facts with some particularity, and finally must show why the official cannot show a valid defense of immunity).

Furthermore, the doctrine of respondeat superior cannot form the basis of a Bivens claim. Robertson v. Sichel, 127 U.S. 507, 515-17 (1988); Rizzo v. Goode, 423 U.S. 362 (1976). Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious liability. Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.) (en banc), cert. denied, 502 U.S. 1074 (1992); Hansen v. Black, 885 F.2d 642, 645-646 (9th Cir. 1989); See also Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991). To find a supervisory official personally liable for the unconstitutional acts of his subordinates it must be shown that the supervisor had a duty to instruct the subordinate to prevent Constitutional harm, and that "as a result of the official's failure to instruct, the Plaintiff was harmed in the manner threatened." Haynesworth v. Miller, 820 F.2d 1245, 1262 (D.C. Cir. 1987); MacKinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Redman, 942 F.2d at 1446-1447; Hansen, 885 F.2d at 646; See also Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989)

31

(inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a Defendant is necessary before he may be found liable for a civil rights violation. See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Stoneking v. Bradford Area School District, 882 F.2d 720, 729-30 (3d Cir.), cert. denied, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury. Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447. A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984). Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible. Ybarra, 723 F.2d at 680.

Here, Plaintiff has not alleged any facts implicating Defendant LaManna in the alleged denial of any Constitutional rights. As such, it is clear that Warden LaManna has been named in this lawsuit solely based upon his position as the Warden and CEO of FCI McKean. Therefore, the Plaintiff's claims against him should be dismissed for failure to show personal involvement.

### G.    All of the Federal Defendants Are Protected from Suit by the Doctrine of Qualified Immunity, Because None of Plaintiff's Clearly Established Constitutional Rights Were Violated.

Summary judgment is appropriate with regard to all of the named defendants based on the

doctrine of qualified immunity. A plaintiff may maintain an action for damages against a federal employee personally, thereby subjecting him or her to personal responsibility for payment of damages, for violating the plaintiff's constitutionally protected rights. Davis v. Passman, 442 U.S. 228 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). The Supreme Court, however, has held that federal executive officials, other than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith immunity from personal liability for civil damages. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978). "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. See also Jeffers v. Gomez, 267 F.3d 895, 910-912 (9th Cir. 2001). This is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511 (1985); see also Hunter v. Bryant, 502 U.S. 224 (1991) (per curiam). Therefore, once an individual raises qualified immunity in a Bivens action, the plaintiff cannot maintain the action against the federal official in his or her individual capacity unless the plaintiff can show that the defendant violated a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226 (1991); Abdul-Akbar v. Watson, 4 F.3d 195 (3d Cir. 1993). This inquiry focuses on whether a reasonable official would have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d at 205; Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993), cert. denied, 114 S.Ct. 559 (1993). Normally, qualified immunity should be decided by the court before trial. Hunter, 502 U.S. at 227. See also Cunningham v. Gates, 229 F.3d 1271 (9th Cir. 2000). The Plaintiff has the burden of showing that the defendant federal employees violated his clearly established Constitutional rights.

33

Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983).

The Supreme Court further clarified the Harlow rule on qualified immunity in Anderson v. Creighton, stating: "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." 483 U.S. at 639 (citation to Harlow omitted). Both questions are to be decided by the court. This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)). As long as a defendant government employee could reasonably have thought his actions were consistent with the rights he was alleged to have violated, the defendant federal employee is entitled to qualified immunity. Anderson, 483 U.S. at 638.

Government officials are not expected to be legal scholars like law professors. Ward v. San Diego County, 791 F.2d 1329, 1332 (9th Cir.), cert. denied sub nom., Duffy v. Ward, 483 U.S. 1020 (1987). The contours of the right allegedly violated must be sufficiently clear so that a reasonable government official would understand that his or her conduct violated the plaintiff's constitutional rights. Officers who reasonably but mistakenly conclude their conduct was lawful are entitled to immunity. Anderson, 483 U.S. at 641; Hunter, 502 U.S. at 228-229.

Furthermore, the Supreme Court recently clarified the standard for the qualified immunity defense, making it much more difficult for Plaintiff to prevail. Saucier v. Katz, 533 U.S. 194 (2001). There, the Court held that the lower courts had been ignoring a significant threshold question. Specifically, this Court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a

34

constitutional right?" Saucier, 533 U.S. at 200-01.   Only if a constitutional violation could be made out from the Plaintiff's allegations does the analysis move to the second sequential step, asking "whether the right in question was clearly established." Id.  The Court went on to caution, however, that this second inquiry is not taken in a broad, general context, but must be "undertaken in light of the specific context of the case." Id.  The reason for such an analysis is to avoid treating prison administrators as attorneys, and holding them to an impossible standard.  As such:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Id. (internal citations omitted).  Thus, if the law "did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982); Malley v. Briggs, 475 U.S. 335 (1986)).

In the present case, Plaintiff has not shown that the Defendants violated any of his Constitutional rights.  See discussion in Sections B-F, supra.  Therefore, he has failed to establish his burden of proof, as required by Saucier, Anderson and Harlow.  Assuming for the sake of argument, however,  that any of Plaintiff's allegations constituted violations of his Constitutional rights, none of those rights were so clearly established as to satisfy the second prong of the Saucier analysis.  As such, all of the Defendants are entitled to qualified immunity.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion to Dismiss Plaintiff's Amended Complaint, or in the Alternative, for Summary Judgment.

Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney

ALBERT SCHOLLAERT
Assistant United States Attorney
Western District of Pennsylvania
U.S. Post Office and Courthouse
700 Grant Street, Suite 400
Pittsburgh, PA 15219
PA ID No. 23629

OF COUNSEL:
Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534