### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNY HILL,

          PLAINTIFF

                            Civil Action No. 05-160E

v.                               Judge McLaughlin
                               Magistrate Judge Baxter

JOHN LAMANNA, ET AL.,           Electronically Filed
              DEFENDANTS

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
### PLAINTIFF'S COMPLAINT, OR IN THE ALTERNATIVE,
### FOR SUMMARY JUDGMENT

AND NOW, come Defendants, John J. LaManna, Debora Forsyth, Marty Sapko, and

Stephen Housler (hereinafter collectively referred to as "Defendants"), by their attorneys, Mary

Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Albert

Schollaert, Assistant U.S. Attorney for said district, and Douglas S. Goldring, Assistant General

Counsel for Federal Prison Industries, Inc., and respectfully move the Court to dismiss the

Complaint filed by Plaintiff, Kenny Hill ("Plaintiff" or "Hill"), or, in the alternative, grant

summary judgment in favor of the Defendants.

I.      **INTRODUCTION**

Plaintiff Hill, a federal inmate, has brought a pro se action styled after the type recognized

by the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of

Narcotics, 403 U.S. 388 (1971).  Plaintiff's claims generally relate to alleged hazardous work

conditions at his UNICOR job assignment at the Federal Correctional Institution, in McKean

County, Pennsylvania ("FCI McKean").  As relief, Plaintiff seeks: (1) Seven million seventeen

thousand dollars ($7,017,000.00) in compensatory and punitive damages; (2) reasonable

attorney's fees and costs; and (3) such other relief as the Court deems proper and just.  See Complaint, page 10.  For the reasons that follow, the Court should dismiss Plaintiff's Complaint or, in the alternative, grant summary judgment in favor of the Defendants.

## II.    THE COMPLAINT

This is one of six related cases currently pending before this court, and relating to the conditions in the UNICOR factory in FCI McKean.[1]  Plaintiff filed this complaint on June 3, 2005.  An Amended Complaint was filed on August 15, 2006.

In his first claim, Plaintiff alleges that, while he was incarcerated in FCI McKean, he was exposed to hazardous substances at his UNICOR work assignment.  Plaintiff also alleges that he was not provided with adequate protective equipment, and that Defendants altered the Material Safety Data Sheet for Micore board .  As a result of these conditions, Plaintiff alleges that he either did suffer serious medical conditions, or is at risk of developing serious medical conditions in the future.  Plaintiff alleges that these conditions violated his Eighth Amendment rights.   See Amended Complaint ¶¶ 29-36.

In his second claim, Plaintiff alleges that Defendants caused him to be negligently exposed to an unsafe work environment.  See Amended Complaint ¶¶ 37-43.

## III.    FACTUAL BACKGROUND

### A.    Background

Plaintiff is Kenny Hill, Register Number 17110-016, a Federal inmate, currently housed in the Federal Correctional Institution (FCI) Petersburg, Virginia.   He was convicted in the

---

[1] The other five related cases are: Davila-Bajana v. Holohan, 04-253;  Michael Hill v.LaManna, 03-323; Kelly v. Sapko, 03-368; Siggers v. LaManna, 03-355; and Ward v. LaManna, 04-11.

District Court for the District of Columbia of Unlawful Possession With Intent to Distribute Five or More Grams of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)B)(III); and Using and Carrying a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1). He was sentenced to a total of 19 years on December 17, 1992. His projected release date is January 3, 2017, via Good Conduct Time Release. See Declaration of Douglas S. Goldring¶ 3, and Attachment A.[2]

Plaintiff arrived at FCI McKean on April 6, 2001, and was first assigned to the Federal Prison Industries, Inc. (FPI or trade name UNICOR) factory on June 19, 2001. On or around August 20, 2004, he was transferred to FCI Petersburg. See Declaration of Martin Sapko ¶ 6, and Attachment B.[3]

FPI is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities. In order to achieve this goal, FPI operates factories in over 100 locations across the country. It manufactures products and services in seven different business groups: Electronics, Clothing & Textiles, Fleet Management & Vehicular Components, Services, Office Furniture, Recycling, and Industrial Products. See Declaration of Martin Sapko ¶ 3.

Typically, each prison (with the exception of minimum security and administrative/ pretrial facilities) in the federal system contains one UNICOR factory which is a division of one of the above referenced business groups. At all times relevant to this case, the FCI McKean

---

[2] Previously submitted as an attachment to Defendants' previous Motion for Summary Judgment. Docket No. 16.

[3] Previously submitted as an attachment to Defendants' previous Motion for Summary Judgment. Docket No. 16.

factory was part of the Office Furniture Business Group.   It is UNICOR's goal to employ a minimum of 25% of all eligible inmates incarcerated in the federal system.  See Declaration of Martin Sapko ¶ 4.

**B.    OSHA Inspection**

On July 3, 2001, the Area Director of the Occupational Safety and Health Administration ("OSHA") sent a letter to Stephen Housler, the Safety Manager at FCI McKean.  The letter advised  Housler that OSHA had received a notice of safety hazards regarding the ventilation system in the UNICOR factory at FCI McKean.  Specifically, the notice of safety hazards alleged that ventilation was inadequate,  employees were being exposed to excessive wood dust, and that dust masks were not readily available.  The letter indicated that OSHA had not made any determination that the alleged hazards existed, nor did OSHA intend to conduct an inspection at that time.  Nevertheless, since allegations of violations and/or hazards had been made, OSHA requested that FCI McKean investigate the alleged conditions and make any necessary corrections or modifications.  See Declaration of Stephen Housler ¶¶ 8-10, and Attachment A.[4]

The Warden responded to OSHA's concerns on July 27, 2001.  In that letter, he described the dust collection system in the UNICOR factory and indicated that dust masks are available in the UNICOR tool room, and are issued upon request.  See Declaration of Stephen Housler ¶ 11, and Attachment B.

Specifically, the UNICOR factory at FCI McKean is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  Each dust collector has the capacity to move 34,000 cubic feet of air per minute from the

---

[4]Previously submitted as an attachment to Defendants' previous Motion for Summary Judgment. Docket No. 16.

UNICOR factory. See Declaration of Martin Sapko ¶ 7, and Attachment C. The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building. According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first. See Declaration of Martin Sapko ¶¶ 8-9.

Dust and air entering the dust collection system are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building. The filtered air is then returned to the factory though square ducts. The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Declaration of Martin Sapko ¶ 10, and Attachments D and E.

On July 31, 2001, in response to the letter from OSHA, FCI McKean had Microbac Laboratories, Inc. conduct an indoor air quality survey of the FCI McKean UNICOR factory. Microbac tested six different sites in the factory, and all of the sites complied with the OSHA standard for total Particulates/Nuisance Dust. See Declaration of Stephen Housler ¶ 12, and Attachment C.[5]

_____

[5]Indeed, the survey results showed that the air quality was well within OSHA standards. According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/ Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/ Respirable Nuisance Dust. According the Microbac survey, the highest measurement for total particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter. See Declaration of Stephen Housler ¶ 13, and Attachment C.

On April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean.  The OSHA Notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes.  The dusts included wood dust, particle board dust and Micoreboard dust.  The Notice also alleged that ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes.  See Declaration of Stephen Housler ¶¶ 14-15, and Attachment D.

On Wednesday, April 16, 2003, an OSHA compliance officer visited the FCI McKean UNICOR factory and conducted a walk-through inspection.  At the conclusion of the walk-through, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and necessary practices were being followed in accordance with OSHA regulations.  The inspector indicated that OSHA inspectors would return to the UNICOR factory to conduct a formal inspection.  See Declaration of Stephen Housler ¶ 16.

On May 14, 2003, the OSHA Compliance Officer conducted an inspection of the UNICOR factory.   On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct an air monitoring of the UNICOR factory.  On or about June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist told Defendant Housler that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory.  See Declaration of Stephen Housler ¶ 17.

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards. The letter included results of the OSHA air monitoring, which had evaluated worker exposures to

airborne dust concentrations of vitreous fiber and perlite. The results showed that no worker's exposure exceeded 10% of the relevant exposure limit. See Declaration of Stephen Housler ¶ 18, and Attachment E.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of Unsafe or Unhealthful Working Conditions was issued. The only cited OSHA violation which is relevant to Plaintiff's complaints regarding hazardous substances in the UNICOR factory air was described as, "Adequate precautions against the ignition of flammable vapors were not taken." 29 C.F.R. § 1910.106(e)(6)(I). See Declaration of Stephen Housler ¶¶ 19-20, and Attachments F-G. The citation indicated the following:

> LokWeld 860/861 had a flash-point of approximately 15 degrees Fahrenheit and was applied to project items from a 5-gallon container with a roller. Mechanical exhaust ventilation in combination with the enclosures were not utilized to control the LokWeld's flammable vapors. Potential ignition sources in the area included but were not limited to the designated smoking area, woodworking machinery, and normal electrical systems. The smoking area was located within approximately 16 feet to 30-feet from the areas where the LokWeld was applied to the items.

Id.

Lokweld 860/861 ("Lokweld") is a spray grade adhesive used in the UNICOR factory at FCI McKean. Lokweld is applied to materials in the UNICOR factory using a sprayer which is located in an enclosed spraying booth, with its own independent exhaust system. See Declaration of Stephen Housler ¶ 21. The booth in which Lokweld is used is a completely enclosed unit. No leaks or other hazards have been identified. Furthermore, if a leak were to form, the vapors emanating from the booth would have a noxious and easily identifiable odor. There have been no reports or complaints of any unusual odors or vapors in or around the Lokweld spray station.

<u>See</u> Declaration of Stephen Housler ¶ 22.

During the OSHA inspection of the UNICOR factory, which occurred from April 16, 2003 through August 1, 2003, OSHA personnel fully inspected the Lokweld spray booth. During its inspection, OSHA did not note any concerns relating to Lokweld fumes emanating from the spray booth, ventilation of the Lokweld, or inmate protection against Lokweld fumes. <u>See</u> Declaration of Stephen Housler ¶¶ 23-28, and Attachments E-G.

By letter dated September 22, 2003, Defendant LaManna informed OSHA that FCI McKean had taken corrective measures regarding all of the identified Unsafe Working Conditions, with four exceptions, which were awaiting additional information from the Bureau of Prisons Central Office. Defendant LaManna's letter advised OSHA that by April 25, 2003, LokWeld glue and the fire cabinet had been removed from the Special Projects Area. The Warden advised that LokWeld would no longer be used in making their products. <u>See</u> Declaration of Stephen Housler ¶ 29-30, and Attachment H.

## III.    <u>LEGAL ARGUMENTS</u>

### <u>BIVENS ACTION</u>

#### A.    <u>Standard for Summary Judgment</u>

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered "forthwith" if there is no genuine issue as to any "material fact." In recent years there has been a dramatic change and much greater willingness of the courts to grant this remedy. In 1986, the Supreme Court decided three cases which greatly liberalized summary judgment practice and encouraged a much greater use of summary judgment by trial courts. <u>See</u> <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986); <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

As stated by Chief Justice Rehnquist, summary judgment now:
is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole... Rule 56 must be construed with due regard not only for the rights of person asserting claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex, 477 U.S. at 327.   "Modern, post-trilogy summary judgment doctrine is a stronger and more aggressive approach to summary judgment practice that places a reduced burden on the movant, greater burdens on the nonmovant, and makes summary judgment more likely to be granted than the pre-trilogy approach."  Moore's Fed. Prac., vol. 11, p. 56-312.1.

One of the essential purposes of the motion is to "isolate and dispose of factually unsupported claims or defenses."  Celotex, 477 U.S. at 323-324.  The defendants have the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's case; and then the plaintiff has the burden to come forward with "specific facts" showing that there is a genuine issue for trial.  LaBounty v. Coughlin, 137 F.3d 68, 73 (2nd Cir. 1998).  The failure to sufficiently support all elements necessary to support a case will render all other facts immaterial.  Celotex, 477 U.S. at 323.

The fact that a plaintiff has some facts on his side, or that there are some factual disputes, is not enough to deny the motion.  The "mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252;  Matsushita Elec. Indus. Co., 475 U.S. at 586 (The motion will not be denied merely because of  "some metaphysical doubt" about the material facts); Davidson v. Scully, 114 F.3d 12, 14 (2nd Cir. 1997)(The existence of  "some" alleged factual dispute is not enough to defeat summary judgment, the opponent must show that

9

there is no "genuine" issue of material fact"); Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd

Cir. 1996)(Mere "conclusory allegations, speculation or conjecture" also will not defeat the

motion); Sunshine Books Ltd. v. Temple University, 697 F.2d 90 (3d Cir. 1982)(The responding

party may not rest on the allegations of his/her pleading but must present by affidavit or

otherwise specific facts sufficient to create a genuine issue of material fact. Fed.R.Civ.P. 56(e)).[6]

### B.    Plaintiff's Allegations Regarding Conditions in the UNICOR Factory Cannot Establish an Eighth Amendment Violation.[7]

Plaintiff's allegation that Defendants violated his Eighth Amendment rights by allegedly

exposing him to environmental hazards must be dismissed because it is clear that Plaintiff has

---

[6] In the alternative, Defendants also seek dismissal of the complaint pursuant to Fed. R. Civ. Pro. 12(b)(6). In a Rule 12(b)(6) Motion to Dismiss, the complaint is liberally construed, and all well-pleaded fact allegations, and any reasonable inferences to be drawn from the facts alleged, viewed in the light most favorable to the non-moving party. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1384 (3d Cir. 1994). This concession of truth, however, goes only to well-pleaded fact allegations, not legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See Mires v. Dekalb County, Ga., 433 U.S. 25, 27 n. 2 (1977); Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993); Davidson v. State of Ga., 622 F.2d 895 (5th Cir. 1980); Wilson v. Lincoln Redevelopment Corp., 488 F.2d 339 (8th Cir. 1973); Stanturf v. Sipes, 335 F.2d 224 (8th Cir.), cert. denied, 379 U.S. 977 (1965); Violenti v. Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1255 (M.D. Pa. 1994).
    Moreover, the claimant must set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist. See Fed. R. Civ. Pro. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-6 (1957).
    In short, the court must dissect the complaint, eliminate mere rhetoric, legal conclusions and unsupported factual conclusions, and determine whether or not well-pleaded fact allegations, when construed in a light more favorable to the Plaintiff, state a factual claim on some legal theory upon which relief can be granted, but not whether a plaintiff will ultimately prevail on that claim. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

[7] Although Plaintiff mentions the Fifth Amendment in the Amended Complaint (¶ 35) in passing, it is not believed that Plaintiff intended to, or does raise any violations of the Fifth Amendment in the complaint. See the Reports and Recommendations in Michael Hill v.LaManna, 03-323; Kelly v. Sapko, 03-368; Siggers v. LaManna, 03-355; and Ward v. LaManna, 04-11.

satisfied neither the objective nor subjective prongs of the Eighth Amendment test.  Farmer v.

Brennan, 511 U.S. 825 (1994) and Helling v. McKinney, 509 U.S. 25, 33-34 (1993).

>    **1.    The Eighth Amendment Standard**

In Helling v. McKinney, 509 U.S. 25 (1993), the Supreme Court held that a cause of

action exists under the Eighth Amendment when a prisoner alleges that prison officials have

exposed him, with deliberate indifference, to levels of environmental tobacco smoke ("ETS")

that pose an unreasonable risk of harm to his future health.  Id. at 35.  In Helling, the Court

established a two-part test that a plaintiff must satisfy to state a valid claim under the Eighth

Amendment.  The first prong is objective.  The Plaintiff must show that "he himself is being

exposed to unreasonably high levels of ETS."  Id. at 35 (emphasis added).  With respect to this

prong, the Eighth Amendment requires a court not only to make a scientific and statistical inquiry

into the seriousness of the potential harm and the likelihood that such injury to health will

actually be caused by exposure to the contaminant, but also "to assess whether society considers

the risk that the prisoner complains of to be so grave that it violates contemporary standards of

decency to expose anyone unwillingly to such a risk."  Id. at 36 (emphasis in original).

The second prong is a subjective one: a plaintiff must show that prison officials were

deliberately indifferent to a serious risk of harm.  Id.  The Supreme Court has held that:

> a prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts for which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In this case, Plaintiff alleges that he was exposed to Micore Board fibers, sawdust,  and

Lokweld adhesive without appropriate ventilation and/or protective gear.  However, the evidence

presented by Plaintiff with respect to this claim fails to establish either prong of the <u>Helling</u> test, because Plaintiff cannot show that he was exposed to "unreasonably high" levels of air pollution or toxins, or that Defendants exhibited deliberate indifference to such exposure.

### 2.  Plaintiff Cannot Establish that he was Actually Exposed to "Unreasonably High Levels" of Hazardous Substances

With respect to the first prong of the Eighth Amendment analysis, Plaintiff cannot show that he was exposed to levels of air pollution or toxins in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency.  Although Defendants agree that crystalline silica, an ingredient in Micore Boards, is classified as a human carcinogen, respirable silica was <u>not</u> detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors.  <u>See</u> Declaration of Stephen Housler ¶¶ 12-13 and 18, Attachments C and E.  Indeed, with respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit. <u>See</u> Declaration of Stephen Housler ¶ 18, Attachment E.  Thus, OSHA determined that Plaintiff and other workers were not exposed to inappropriate levels of contaminants in the UNICOR factory.  Plaintiff simply cannot, in this case, "show that he himself is being exposed to unreasonably high levels of" harmful substances, as required by <u>Helling</u>, where the UNICOR facility is in compliance with the relevant federal air quality standards.

Additionally, in the Complaint, Plaintiff alleges that Defendants' failure to provide him with a NIOSH-approved respirator also constituted a violation of his Eighth Amendment rights. The Micore Fiber MSDS sheet clearly discusses the circumstances under which a NIOSH-approved respirator should be used. Section VIII of the MSDS indicates that special respiratory protection is "not typically necessary under normal conditions of use."  <u>See</u> Declaration of

Stephen Housler ¶ 32, and Attachment I.  A NIOSH-approved respirator is necessary only "in poorly ventilated areas, if TLV is exceeded and/or when dusty conditions exist."  See Declaration of Stephen Housler ¶¶ 34-35, and Attachments C, E and I.[8]  Here, however, Defendants' evidence establishes that Plaintiff was exposed only to air that comported with federal guidelines, was not poorly ventilated or unusually dusty, and that any American might be exposed to on a daily basis in the course of his or her job.  See Declaration of Stephen Housler ¶¶ 18 and 35, and Attachments C, E and I; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.  Based upon the tests and inspections conducted by the OSHA inspectors, the conditions in the UNICOR factory did not require the Defendants to take any other precautions with respect to the use and processing of Micore Board.  See Declaration of Stephen Housler ¶¶ 18 and 32-34, and Attachments C, E and I.  Although several suggestions were made to increase the safety measures available to personnel assigned to the UNICOR factory, these were recommendations only, and OSHA fully recognized that levels of contaminants in the UNICOR factory were well within the applicable guidelines.  See Declaration of Stephen Housler ¶ 18, and Attachment E.

Because the respiratory exposure level for dangerous contaminants amounted to a mere 10% of the relevant exposure limit, and BOP did not violate requirements regarding safety precautions, the risk to Plaintiff simply cannot amount to a level so grave that it violates contemporary standards of decency as required under the Helling test.  OSHA standards reflect

---

[8] The same is true for sawdust which Plaintiff alleges was in the air as a result of the work being conducted on particle board.  A review of the MSDS sheet for Temple-Inland Particle board, however, indicates that this product is perfectly safe, as long as the area is properly ventilated.  Again, the factory is extremely well ventilated, and no concerns with the ventilation system have ever been noted by OSHA inspectors.  The MSDS does not recommend the use of a respirator when working with this product.  See Declaration of Stephen Housler ¶ 46, and Attachment K; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E.

contemporary standards of decency – our society willingly exposes free citizens and inmates alike to toxins, chemicals, and particulates up to the threshold values established by OSHA.  See, e.g., Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005);  Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004). The conditions present in the UNICOR building did not violate OSHA standards.  As such, Plaintiff cannot establish the objective prong of the Eighth Amendment test, and his Eighth Amendment claim must be dismissed.

Numerous cases support the proposition that an inmate's Eighth Amendment claim based on exposure to hazardous substances or poor air quality cannot survive summary judgment where the correctional facility is in substantial, even if imperfect, compliance with the relevant state and/or federal standards.  The United States District Court for the Western District of New York recently addressed a § 1983 claim by *pro se* prisoners that New York state correctional officials had violated their Eighth Amendment rights by exposing them to inadequate ventilation and poor air quality at their inmate work assignments.  See Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir. Feb. 17, 2005).  The inmates, who worked in a print shop, alleged that the ventilation system and air quality in the shop were inadequate, causing them headaches, nausea, skin irritation, increased blood pressure, and sinus problems.  See id. at *1.  In support of their claims, plaintiffs submitted a report by an OSHA specialist that he had concerns regarding the ability of the ventilation system to remove toxic chemicals from the breathing zones of the workers in order to create a safe working environment. See id.  The OSHA specialist had not taken air quality samples.  An industrial hygienist associated with the state department of corrections later conducted air quality tests to determine whether employees were being exposed to hazardous chemicals at levels that exceeded state

14

guidelines. Id. at *2. The air quality tests confirmed that the substances tested were below the permissible levels set by the state. Id. Based on the air quality tests, the correctional officials determined that the air quality in the print shop did not pose an unreasonable risk to inmate employees' health. Id.

The Wooten Court agreed with the correctional officials' decision and granted summary judgment in their favor. The Court concluded that plaintiffs had not shown that the allegedly poor ventilation in the print shop was serious enough to satisfy the objective element of their Eighth Amendment claim. Id. at *5. The Court acknowledged that plaintiffs' evidence had shown that OSHA had made recommendations for improvements to the print shop air quality. Id. However, plaintiffs' evidence did not show that the air quality failed to comply with federal workplace safety standards. Id. Moreover, defendants' evidence regarding air quality indicated that print shop workers were not being "excessively exposed to hazardous materials." Id. Finally, plaintiffs had not offered evidence to show that defendants' air quality tests were erroneous or unreliable. Id. Accordingly, plaintiffs failed to raise a triable issue of fact with respect to the objective element of their Eighth Amendment claim. See also Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004)(granting summary judgment to state prison officials in § 1983 Eighth Amendment claim by asthmatic inmate who alleged his work assignment in boot factory exposed him to hazardous chemicals, dust, and glue fumes. Defendants were entitled to summary judgment based on fact that boot factory had been inspected and air quality met OSHA standards).

Similarly, the United States District Court for the District of Delaware granted summary judgment in favor of state correctional officials on an inmate's claim that he was exposed to unreasonably high levels of environmental tobacco smoke ("ETS"), in violation of his Eighth

Amendment rights.  See Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002).  In

Baker, the inmate provided an affidavit that he was exposed to "cloudy," "very smoky"

conditions, as well as a chart detailing the time of day and the number of inmates smoking at any

given time over the course of a five-day period.  Id.  He also produced affidavits from several

other inmates in support of his claims.  Id.   The Baker Court granted summary judgment in

favor of defendant prison officials because, even if plaintiff had shown that he was subject to

some level environmental tobacco smoke, he had not "provid[ed] competent evidence as to the

level of such ETS."  Id.  Accordingly, the Court found that the inmate failed to meet the Supreme

Court's requirement in Helling that he show his exposure to a toxin "created a risk [that] is so

grave that it violates contemporary standards of decency to expose anyone unwillingly to such a

risk."  Id. (quoting Helling, 509 U.S. at 36).  See also Jones v. Kearney, 2001 WL 1414854

(D.Del., Nov. 2, 2001)(granting defendant correctional officials' 12(b)(6) motion on inmate's

Eighth Amendment claim where plaintiff inmate could not show that he himself was being

exposed to "unreasonably high levels" of environmental tobacco smoke, because the institution

had an "open air only" smoking policy).  Here, like the inmate in Baker, Plaintiff Ward cannot

show that he was exposed to a level of air pollution, dust, or toxins that created a risk so grave as

to violate contemporary standards of decency.  To the contrary, Defendants have come forward

with conclusive evidence establishing that the UNICOR factory certainly did not expose Plaintiff

to that kind of risk.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

Courts have granted summary judgment in favor of prison officials even where the

correctional facility is not in compliance with applicable federal standards.  In Carroll v. DeTella,

255 F.3d 470 (7th Cir. 2001), the United States Court of Appeals for the Seventh Circuit granted

summary judgment in favor of Illinois correctional officials on plaintiff's Eighth Amendment

claim that the prison drinking water was contaminated with radium. There, it was undisputed that the radium levels in the drinking water of the correctional facility <u>did</u> exceed the maximum level set by the United States Environmental Protection Agency ("EPA"). <u>See</u> <u>id.</u> at 472. However, despite the fact that the correctional facility's radium level continued to exceed the federal maximum, the state environmental agency informed the plaintiff-inmate that other communities in Illinois had water supplies that also exceeded the federal maximum. Plaintiff was also informed that no remedial action would be taken to address radium levels, because the EPA was considering raising the maximum level. However, at the time plaintiff filed suit, the EPA had not raised the radium standard, and the plaintiff continued to be subject to radium levels that violated the applicable federal standards. Nonetheless, the Seventh Circuit affirmed the District Court's grant of summary judgment in favor of prison officials.

In granting summary judgment, the <u>Carroll</u> Court recognized that prisons are not under a duty to provide a maximally safe environment, completely free from pollution or safety hazards. <u>Id.</u> Because many Americans live under conditions of exposure to various contaminants, the Court acknowledged that the Eighth Amendment does not require prisons to provide prisoners with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." <u>Id.</u> (internal citations omitted). As the Court recognized,

> It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures. If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

<u>Id.</u> at 472-73.

Here, Plaintiff Hill is being exposed to air quality and working conditions that OSHA, and our society, deems to be entirely acceptable for all persons, whether free or incarcerated. Because Plaintiff simply cannot show that he was subjected to "unreasonably high" levels of air pollutants, he has failed the objective portion of the <u>Helling</u> Eighth Amendment test, and summary judgment must be entered in favor of Defendants.

**3.    Plaintiff Cannot Establish Deliberate Indifference on the Part of <u>Prison Officials</u>**[9]

Even assuming that Plaintiff had satisfied the objective portion of the Eighth Amendment test, which he has not, he cannot show deliberate indifference on the part of prison officials, as required by the subjective portion of the <u>Helling</u> test. As discussed in section 2, supra, Defendants' compliance with OSHA standards clearly insulates them from liability. <u>See Helling</u>

---

[9] Pursuant to the Prison Litigation Reform Act, Pub.L.No. 104-134, 110 Stat. 1321 (April 26, 1996) (PLRA) "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a **prior showing of physical injury**." PLRA, 42 U.S.C. § 1997e(e)(emphasis added). <u>Mitchell v. Horn</u>, 318 F.3d 523, 533-36 (3d Cir. 2003); <u>Davis v. District of Columbia</u>, 158 F. 3d 1342 (D.C. Cir. 1998); <u>Zehner v. Trigg</u>, 133 F. 3d 459 (7th Cir. 1997).

It is well settled that fear of a future medical condition does not constitute a physical injury for purposes of the PLRA. <u>See Fontroy v. Owens</u>, 150 F.3d 239, 243 (3d Cir. 1998); <u>Herman v. Holiday</u>, 238 F.3d 660, 665-66 (5th Cir. 2003)(§ 1997e(e) bars claims for mental and emotional damages caused by the fear that one's exposure to environmental hazards may result in exposure related diseases).

Additionally, during the periods of time in which Plaintiff was assigned to the UNICOR factory, , he neither reported <u>any</u> work-related health problems, nor did his medical records indicate that he suffered from any work related health problems or injuries. <u>See</u> Declaration of Douglas S. Goldring ¶ 5, and Attachment C; Declaration of Stephen Housler ¶¶ 47-48; Declaration of Martin Sapko¶ 11; Declaration of Debora Forsyth ¶ 8 (Previously submitted as an attachment to Defendants' previous Motion for Summary Judgment. Docket No. 16.)

Therefore, his Eighth Amendment claim relating to exposure to environmental hazards must be dismissed pursuant to the PLRA, 42 U.S.C. § 1997e(e).

v. McKinney, 509 U.S. 25 (1993); Wooten v. Goord, 2004 WL 816919 (W.D.N.Y., Mar. 25, 2004), aff'd., 2005 WL 387971 (2nd Cir., Feb 17, 2005); Saahir v. Holligan, 2004 WL 1418790 (N.D. Tex., June 24, 2004); Baker v. Williams, 2002 WL 31015630 (D.Del., Sept. 10, 2002); Jones v. Kearney, 2001 WL 1414854 (D.Del., Nov. 2, 2001). Furthermore, even assuming, arguendo, that Defendants' compliance with OSHA standards is not enough, Defendants respectfully assert that they did evaluate, and comply with, the Material Safety Data Sheets for substances utilized in the UNICOR factory.

Courts have established that, with respect to the subjective prong of the Eighth Amendment analysis, Defendants are not deliberately indifferent to plaintiffs' health where they conduct air quality testing and results comply with federal standards. In Carroll, the Seventh Circuit stated that even if inmate print shop employees had met the objective portion of their burden, they could not satisfy the subjective element despite the fact that defendants were on notice that the ventilation system may have needed improvements. See 2004 WL 816919, at *5. "Any claim that defendants were aware that the conditions in the Print Shop posed an excessive risk to plaintiffs' health is belied by the subsequent inspections of the Print Shop, which revealed that the air quality was acceptable according to federal standards." Id. at *5.

Here, as in Carroll, OSHA conducted air quality tests and concluded that the air quality in the UNICOR factory was well within applicable acceptable guidelines for the relevant contaminants. See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E. It was thus reasonable for FCI McKean to rely on available air quality test results to determine what, if any, safety equipment it needed to make available for staff and inmates assigned to the UNICOR factory. There is no genuine issue of fact as to whether Defendants were both aware of, and disregarded, an excessive and serious risk to Plaintiff Hill's health. The Court may not

hold Defendants to a higher standard than that required by federal agencies who are charged with monitoring workplace safety. Therefore, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim, and it must be dismissed from this civil action.

Moreover, even if compliance with OSHA standards was not sufficient to insulate Defendants from being deemed deliberately indifferent, Defendants also relied on, and acted consistently with, the applicable MSDS sheets and product warning labels in determining what protective equipment to provide for UNICOR employees. MSDS sheets are required to, and do, list risks associated with overexposure to various chemicals. More importantly, however, the MSDS sheets set forth what precautions, if any, must be taken in order to protect against such risks. See Declaration of Stephen Housler ¶ 33. Defendants' decisions regarding the UNICOR work environment and protective equipment were consistent with the MSDS sheets and with product warning labels. See Exhibit 2 ¶¶ 32-38, and Attachment C, E, I, and J.

The product warning label for Micore Board states: "Dust hazard. Cut and trim with knife, razor, or hand saw. Do not cut with power equipment unless a dust collector is used on the equipment or local exhaust is used and a NIOSH/MSHA-approved respirator is worn." See Declaration of Stephen Housler ¶ 38, and Attachment J. Defendants do not dispute that power equipment was used to cut Micore Board. However, in accordance with the Micore 300 label, the UNICOR factory employed a dust collector on the cutting equipment. See Declaration of Stephen Housler ¶ 36; Declaration of Martin Sapko ¶¶ 7-10, and Attachments C-E. Because the UNICOR factory used a dust-collector system instead of local exhaust, a NIOSH/MSHA-approved mask was not required. See Declaration of Stephen Housler ¶¶ 34-38, and Attachments I-J.

The MSDS for Micore Board is also instructive in establishing that NIOSH/MSHA-approved masks are <u>not</u> required when a dust collecting system is in use.[10]  <u>See</u> Declaration of Stephen Housler  ¶¶ 32-35, and Attachment C, E, and I.  An MSDS is a technical bulletin prepared by chemical manufacturers and importers to supplement the information contained on product labels.  29 C.F.R. § 1910.1200, App. E.  Pursuant to OSHA regulations, employers may rely on the information contained on the product labels, as supplemented by the MSDS, and have no independent duty to analyze the chemical or evaluate the hazards of it.  <u>See</u> Declaration of Stephen Housler ¶ 33.

Section VII of the MSDS for Micore Board provides:

**Respiratory protection:** Not typically necessary under normal conditions of use.  Provide general ventilation and local exhaust ventilation to meet TLV [(Threshold Limit Values)]  requirements of individual ingredients and to control dusting conditions.  Wear a NIOSH/MSHA-approved dust respirator in poorly ventilated areas, if TLV is exceeded, and/or when dusty conditions exist.  Avoid prolonged and repeated breathing of dust.

<u>See</u> Declaration of Stephen Housler ¶ 32, and Attachment I.

Thus, according to the MSDS for Micore Board, there are three situations which would necessitate the use of respirators when working with Micore Board: (1) in poorly ventilated areas; (2) if Threshold Limit Values are exceeded; or (3) when dusty conditions exist.  <u>See</u> Declaration of Stephen Housler ¶ 35, and Attachment I.  However, the air quality tests performed by OSHA in the UNICOR factory definitively establish that the UNICOR factory was not poorly-

---

[10]Pursuant to the Hazard Communication Standard ("HCS") promulgated by OSHA, chemical manufacturers and importers must evaluate the hazards of chemicals they produce or import.  Using that information, they must prepare labels for containers, and the more detailed MSDS technical bulletins.  Chemical manufacturers, importers and distributors of hazardous chemicals are required to provide the appropriate labels and MSDS to the employer to which they ship the chemicals.  29 C.F.R. §1910.1200, App. E.  <u>See</u> Declaration of Stephen Housler ¶ 33.

ventilated, that the Threshold Limit Values for hazardous ingredients of Micore Board were not exceeded, and that dusty conditions did not exist.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E. Indeed, the evidence shows that air quality tests conducted in 2001 and 2003, by Microbac Laboratories and by OSHA, respectively, revealed that the respiratory particulates were well below applicable OSHA limits.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.   More specifically, with respect to the level of dust in the UNICOR factory, the objective air quality tests show that the total particulate level was 1.1 mg per cubic meter, which is well below the applicable TLV standard for total Particulates/Nuisance Dust – 15 mg per cubic meter.  See Declaration of Stephen Housler ¶¶ 12-13, 18, and Attachments C and E.

It is also clear that the UNICOR factory at FCI McKean was more than adequately ventilated.  Specifically, the factory is equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums and a waste portal.  The dust collectors have been operational in the FCI McKean UNICOR factory since approximately September 11, 1989, and each dust collector has the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory.  See Declaration of Martin Sapko ¶7, and Attachment C.

The dust collection system is connected to the furniture-manufacturing machinery in the UNICOR building.  According to operational procedures in the UNICOR factory at FCI McKean, the manufacturing machinery is not to be operated unless the dust collection system is turned on first.[11]  See Declaration of Martin Sapko ¶8.

---

[11]  Micore Board is initially cut to size on the SCMI Horizontal Beam Panel Saw. This machine has two dust collection connections: (1)  a six inch port connected to the bottom and (2) a five inch port connected to the top portion of the machine.  Each of these connections provides dust collection to the saw blade at the point of machining.  In the next step of the process, the

The "Special Precautions" section of the Micore Board MSDS provides further support for the determination that a respirator was not necessary.  That section indicates that "[o]ver-exposure to dust can cause eye, skin, nose, throat or respiratory irritation...  Do not cut with power equipment unless either a dust collector is used on the equipment or local exhaust is used and NIOSH/MSHA-approved respirator is worn."  See Declaration of Stephen Housler ¶¶ 32-37, and Attachment I.  This language is similar, but not the same as, the warning contained on the Micore Board product label.  The use and placement of the words either and or in the MSDS indicates that at times when the Micore Board is cut with power equipment, the factory could implement one of two precautions: either use a dust collector system, or use local exhaust and NIOSH/MSHA-approved respirators.   Defendants reasonably opted to employ a dust collector system.  See Declaration of Stephen Housler ¶ 38, and Attachment J; Declaration of Martin Sapko  ¶¶ 7-10, and Attachments C-E.  The MSDS does not indicate that, where a dust collector

---

four edges of the Micore Board are shaped on the Delta Shaper machine.  This machine has one four inch port connected to the shaper fence, which supplies dust collection directly at the point of machining.  In the third and final machining operation, the Onsrud Inverted Router is used to create a pocket in the back side of the Micore Board for support brackets.  This operation is only performed on half of the quantity ordered.  This machine has a six inch port connected to the bottom supplying dust collection directly to the point of machining and a four inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, that are not collected from the bottom.  All of the aforementioned machines are connected to the main dust collection plenum leading to one of the two main dust collection systems.  See Declaration of Martin Sapko ¶9.

Dust and air entering the dust collection system through spiral pipes such as the ones described above are moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building.  The spiral pipes referenced above, are actually smooth on the inside for better dust collection.  The vacuum pulls dust and air from the factory to one of the two large cone-shaped filter houses where air is filtered and dust is evacuated into to a hopper, which is also located outside of the UNICOR building.  The filtered air is then returned to the factory though square ducts.  The dust that is filtered from the factory air is collected in a hopper and disposed at a site away from FCI McKean and the UNICOR factory. See Declaration of Martin Sapko ¶10, and Attachments D-E.

is used on the equipment, NIOSH-approved respirators are also required.  See Declaration of

Stephen Housler ¶¶ 32-37, and Attachment I.  Defendants' interpretation of the applicable safety

requirements for Micore Board is consistent with the findings of the OSHA inspectors, who

recommended, but did not require, the use of NIOSH-approved respirators.  See Declaration of

Stephen Housler ¶ 18, and Attachment E.

    With respect to Plaintiff's claims regarding exposure to Lokweld, a spray-grade adhesive

that is used in the UNICOR factory, the MSDS for Lokweld expressly states that a respirator is

only required "in case of insufficient ventilation."  See Declaration of Stephen Housler,

Attachment G.  Lokweld is applied to materials in the UNICOR factory using a sprayer, which is

located in an enclosed spraying booth with an independent exhaust system.  See Declaration of

Stephen Housler ¶ 21.  The booth in which Lokweld is used is completely enclosed, and no leaks

or other hazards have been identified relating to Lokweld.  See Declaration of Stephen Housler ¶

22.  Had a leak developed, vapors emanating from the booth would have had a noxious and

easily identifiable odor.  See Declaration of Stephen Housler ¶ 22.  FCI McKean has not received

any complaints about odors in or around the Lokweld station, nor has the Safety Manager ever

noticed any unusual odors in the area. See Declaration of Stephen Housler ¶ 22.

    Moreover, when OSHA inspected the UNICOR factory between April and August of

2003, they fully inspected the Lokweld spray booth.  See Declaration of Stephen Housler ¶ 23.

The OSHA inspectors did not reveal any concerns relating to any Lokweld fumes emanating

from the spray booth.  See Declaration of Stephen Housler ¶¶ 24-25, and Attachment F.   The

only concerns the OSHA inspectors had regarding the use of Lokweld in the UNICOR factory

related to (1) the combustibility of Lokweld when stored near certain wood products; and (2) an

isolated unauthorized use of Lokweld by an inmate to glue two boards by hand in the factory.

See Declaration of Stephen Housler ¶¶ 24-27, and Attachment F.  FCI McKean corrected each of

OSHA's concerns relating to Lokweld by September 22, 2003.  See Declaration of Stephen

Housler ¶ 29, and Attachment H.  Accordingly, Plaintiff's concerns about Lokweld are

contradicted by the results from the OSHA inspection, the MSDS sheet for Lokweld, and the

Declaration of Safety Manager Housler, each of which indicates that Lokweld fumes were not

emanating into the UNICOR factory, and that Plaintiff was not improperly exposed to Lokweld.

In conclusion, Defendants properly relied on objective air quality data, the results of the

OSHA inspection of the UNICOR factory, and the relevant MSDS sheets in making decisions

regarding UNICOR factory conditions and necessary protective equipment.  They were in no way

deliberately indifferent to Plaintiff's health and safety in relying on this objective, federally

sanctioned information, and Defendants are entitled to summary judgment on Plaintiff's Eighth

Amendment claim.[12]

**C.      Defendant LaManna Must Be Dismissed From This Action Because Plaintiff**

---

[12] Plaintiff further alleges that Defendants violated his Fifth and Eighth Amendment rights by altering the Material Safety Data Sheet (MSDS) for Micore Fiber.  See Complaint ¶ 18. Even if this allegation could satisfy Fifth or Eighth Amendment standards, Plaintiff has provided no evidence that he was actually harmed by the alleged alteration to the MSDS sheet. Specifically, Plaintiff was not provided with a respirator because: a) it was determined that a respirator was not required, and b) he never requested one.  See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler ¶¶ 32-46; Declaration of Debora Forsyth ¶ 8.  An unauthorized marking or alteration which was allegedly made on the MSDS sheet, and never noticed by any staff member at the time, played no part in this calculus.  See Declaration of Martin Sapko ¶ 12; Declaration of Stephen Housler ¶¶ 32-46; Declaration of Debora Forsyth ¶ 8. Finally, because copies of the MSDS sheets are readily available on the factory floor, any staff or inmate in the factory could place an unauthorized marking or alteration on an MSDS sheet.  Such handwritten alterations to an MSDS sheet are not authorized by Defendant Housler or anyone else in the institution.  See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler ¶¶ 43-45; Declaration of Debora Forsyth ¶ 9.  Nonetheless, if an alteration to the MSDS sheet had been brought to the attention of staff, it would have been replaced as soon as practicable.  See Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler ¶¶ 43-45; Declaration of Debora Forsyth ¶ 9.

**Has Plead No Claims Against Him And, Therefore, Can Show No Personal
Involvement.**

In order to state a viable civil rights claim, a plaintiff must plead two essential elements:
1) that the conduct complained of was committed by a person acting under color of law; and 2)
that said conduct deprived the Plaintiff of a right, privilege, or immunity secured by the
Constitution or laws of the United States.  Groman v. Township of Manalapan, 47 F.3d 628, 638
(3d Cir. 1995); Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

An inmate must plead and later prove that some affirmative act or omission was
committed by the individual Defendant to submit him to personal liability for the actions of
another person.  Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974).  Indeed, complaints
combining conclusory allegations, absent reference to material facts, will not survive motions to
dismiss.  Geter v. Fortenberry, 849 F.2d 1550, 1553 (5th Cir. 1988).  See also Kennedy v. City of
Cleveland, 797 F.2d 297 (6th Cir. 1986), cert. denied, 479 U.S. 1103 (1987); Cotner v. Hopkins,
795 F.2d 900 (10th Cir. 1986);  Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)(a Plaintiff
attempting to present a civil action against individual government officials must be able to
present material facts on which he contends he can establish a right to recovery, such a Plaintiff
should also be able to state those facts with some particularity, and finally must show why the
official cannot show a valid defense of immunity).

Furthermore, the doctrine of respondeat superior cannot form the basis of a Bivens claim.
Robertson v. Sichel, 127 U.S. 507, 515-17 (1988); Rizzo v. Goode, 423 U.S. 362 (1976).
Supervisory personnel are generally not liable in a civil rights action under the theory of
vicarious liability.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.) (en banc),
cert. denied, 502 U.S. 1074 (1992); Hansen v. Black, 885 F.2d 642, 645-646 (9th Cir. 1989); See

26

also Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991). To find a supervisory official personally liable for the unconstitutional acts of his subordinates it must be shown that the supervisor had a duty to instruct the subordinate to prevent Constitutional harm, and that "as a result of the official's failure to instruct, the Plaintiff was harmed in the manner threatened." Haynesworth v. Miller, 820 F.2d 1245, 1262 (D.C. Cir. 1987); MacKinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Redman, 942 F.2d at 1446-1447; Hansen, 885 F.2d at 646; See also Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a Defendant is necessary before he may be found liable for a civil rights violation. See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Stoneking v. Bradford Area School District, 882 F.2d 720, 729-30 (3d Cir.), cert. denied, 493 U.S. 1044 (1990).

A sufficient causal connection may be established by showing that the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury. Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447. A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984).

Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly

train or supervise personnel, or from an official policy or custom for which the defendants were

responsible.  Ybarra, 723 F.2d at 680.

Here, Plaintiff has not alleged any facts implicating Defendant LaManna in the alleged

denial of any Constitutional rights.  As such, it is clear that Warden LaManna has been named in

this lawsuit solely based upon his position as the Warden and CEO of FCI McKean.  Therefore,

the Plaintiff's claims against him should be dismissed for failure to show personal involvement.


     **D.**     **All of the Federal Defendants Are Protected from Suit by the Doctrine of**
                    **Qualified Immunity, Because None of Plaintiff's Clearly Established**
                    **Constitutional Rights Were Violated.**

Summary judgment is appropriate with regard to all of the named defendants based on the

doctrine of qualified immunity.   A plaintiff may maintain an action for damages against a federal

employee personally, thereby subjecting him or her to personal responsibility for payment of

damages, for violating the plaintiff's constitutionally protected rights.  Davis v. Passman, 442

U.S. 228 (1979); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403

U.S. 388 (1971).  The Supreme Court, however,  has held that federal executive officials, other

than those performing adjudicatory or prosecutorial functions, are entitled to qualified good faith

immunity from personal liability for civil damages. Saucier v. Katz, 533 U.S. 194, 121 S.Ct.

2151 (2001); Harlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478

(1978).  "[G]overnment officials performing discretionary functions are shielded from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

Constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at

818.  See also Jeffers v. Gomez, 267 F.3d 895, 910-912 (9ᵗʰ Cir. 2001).  This is an "immunity

from suit rather than a mere defense to liability."  Mitchell v. Forsyth, 472 U.S. 511 (1985); see

also Hunter v. Bryant, 502 U.S. 224 (1991) (*per curiam*).   Therefore, once an individual raises

qualified immunity in a Bivens action, the plaintiff cannot maintain the action against the federal

official in his or her individual capacity unless the plaintiff can show that the defendant violated

a clearly established Constitutional right. Siegart v. Gilley, 500 U.S. 226 (1991); Abdul-Akbar v.

Watson, 4 F.3d 195 (3d  Cir. 1993). This inquiry focuses on whether a reasonable official would

have found the defendants' conduct to be illegal. Abdul-Akbar, 4 F.3d  at 205; Bryant v. Muth,

994 F.2d 1082, 1086 (4ᵗʰ Cir. 1993), cert. denied, 114 S.Ct. 559 (1993).   Normally, qualified

immunity should be decided by the court before trial.  Hunter, 502 U.S. at 227.  See also

Cunningham v. Gates, 229 F.3d 1271 (9ᵗʰ Cir. 2000).  The Plaintiff has the burden of showing

that the defendant federal employees violated his clearly established Constitutional rights.

Zeigler v. Jackson, 716 F.2d 847 (11ᵗʰ Cir. 1983).

The Supreme Court further clarified the Harlow rule on qualified immunity in Anderson

v. Creighton, stating: "whether an official protected by qualified immunity may be held

personally liable for an allegedly unlawful official action generally turns on the 'objective legal

reasonableness' of the action, ... assessed in light of the legal rules that were 'clearly established'

at the time it was taken."  483 U.S. at 639 (citation to Harlow omitted).  Both questions are to be

decided by the court. This standard "gives ample room for mistaken judgments by protecting all

but the plainly incompetent or those who knowingly violated the law."  Hunter v. Bryant, 502

U.S. 224, 229 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).  As

long as a defendant government employee could reasonably have thought his actions were

consistent with the rights he was alleged to have violated, the defendant federal employee is

entitled to qualified immunity.  <u>Anderson</u>, 483 U.S. at 638.

Government officials are not expected to be legal scholars like law professors.  <u>Ward v.</u>
<u>San Diego County</u>, 791 F.2d 1329, 1332 (9th Cir.), <u>cert.</u> <u>denied</u> <u>sub</u> <u>nom.</u>, <u>Duffy v. Ward</u>, 483
U.S. 1020 (1987).  The contours of the right allegedly violated must be sufficiently clear so that a
reasonable government official would understand that his or her conduct violated the plaintiff's
constitutional rights.  Officers who reasonably but mistakenly conclude their conduct was lawful
are entitled to immunity.  <u>Anderson</u>, 483 U.S. at 641;  <u>Hunter</u>, 502 U.S. at 228-229.

Furthermore, the Supreme Court recently clarified the standard for the qualified immunity
defense, making it much more difficult for Plaintiff to prevail.  <u>Saucier v. Katz</u>, 533 U.S. 194
(2001).  There, the Court held that the lower courts had been ignoring a significant threshold
question.  Specifically, this Court must consider whether, "[t]aken in the light most favorable to
the party asserting the injury, [] the facts alleged show the officer's conduct violated a
constitutional right?"  <u>Saucier</u>, 533 U.S. at 200-01.   Only if a constitutional violation could be
made out from the Plaintiff's allegations does the analysis move to the second sequential step,
asking "whether the right in question was clearly established."  <u>Id.</u>  The Court went on to caution,
however, that this second inquiry is not taken in a broad, general context, but must be
"undertaken in light of the specific context of the case."  <u>Id.</u>  The reason for such an analysis is to
avoid treating prison administrators as attorneys, and holding them to an impossible standard.  As
such:

> The contours of the right must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right.  The relevant, dispositive inquiry in
> determining whether a right is clearly established is whether it would be clear to a
> reasonable officer that his conduct was unlawful in the situation he confronted.

<u>Id.</u> (internal citations omitted).  Thus, if the law "did not put the officer on notice that his conduct

would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982); Malley v. Briggs, 475 U.S. 335 (1986)).

In the present case, Plaintiff has not shown that the Defendants violated any of his Constitutional rights. See discussion in Sections B-F, supra. Therefore, he has failed to establish his burden of proof, as required by Saucier, Anderson and Harlow. Assuming for the sake of argument, however, that any of Plaintiff's allegations constituted violations of his Constitutional rights, none of those rights were so clearly established as to satisfy the second prong of the Saucier analysis. As such, all of the Defendants are entitled to qualified immunity.

## FEDERAL TORT CLAIMS ACT ACTION

**A.    To the Extent Plaintiff States a Claim Pursuant to the Federal Tort Claims Act (FTCA), Relating to the Conditions in the UNICOR Factory, (Count Two) this Case must Be Dismissed, Pursuant to Rule 12(b)(1), Because There Is No Subject Matter Jurisdiction.**

### 1.    Standard for Dismissal Pursuant to Rule 12(b)(1)

A defense of lack of jurisdiction over the subject matter may come in one of two forms: a facial attack or a factual attack. Gould Electronics, Inc. v. United States, 220 F.3d 169, 176 (3rd Cir. 2000); Mortensen v. First. Fed. Sav. And Loan Ass'n., 549 F.2d 884, 891 (3rd Cir. 1977). In a facial attack, the defense merely files a Rule 12 (b)(1) motion with no supporting documents, affidavits or other factual allegations. Id.; PBGC v. White, 998 F.3d 1192, 1196 (3rd Cir. 1993); Paterson v. Weinberger, 644 F. 2d 521, 523 (5th Cir. 1981). In reviewing a facial attack, therefore, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Id.

31

The Court, however, is not limited to the face of the complaint in determining a Rule 12(b)(1)motion. In a factual attack, the court may also consider evidence outside the pleadings, including affidavits, testimony, depositions, documents and other evidence to resolve factual issues bearing upon jurisdiction. Gould Electronics, 220 F.2d at 176; Gotha v. United States, 115 F.3d 176, 178-79 (3rd Cir. 1997); Biotecs Research Corp. v. Heckler, 710 F.2d 1375, 1379 (9th Cir 1983) (consideration of materials outside the pleadings will not convert a 12(b)(1) motion into one for summary judgment).[13]

Regardless of whether the motion is based upon a facial attack or a factual attack, once the defense of lack of jurisdiction over the subject matter is raised, the Plaintiff bears the burden of showing why the case should not be dismissed. Gibbs v. Buck, 307 U.S. 66, 72, 59 S.Ct. 725 (1939); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3rd Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839 (1991); Mortensen, 549 F.2d at 891. Plaintiff's burden, however, is lighter than a motion to dismiss pursuant to Rule 12(b)(6). Dismissal here is only appropriate where, "the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a Federal controversy." Growth Horizons, Inc. v. Delaware Cty., Pa., 938 F.2d 1277, 1280-81 (3rd Cir. 1993)(citing cases).

The United States, as a sovereign is immune from lawsuit except to the extent it consents to be sued. FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996 (1994); Lehman v. Nakshian, 453 U.S. 156, 101 S.Ct. 2698 (1981); Matsko v. United States, 372 F.3d 556 (3rd Cir. 2004). Thus, it is axiomatic that unless the United States expressly waives this immunity, a district court will

---

[13] Unlike a Rule 12(b)(6) motion, in a Rule 12(b)(1) Motion to Dismiss, the Court may resolve issues of fact relating to jurisdiction for itself. Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396 (1981); Biase v. Kaplan, 852 F. Supp. 2d 268, 277 (D. NJ 1994).

have no subject matter jurisdiction to hear the suit.  Meyer, 510 U.S. at 475, 114 S.Ct. at 100;

U.S. v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965 (1983); U.S. v. Testan, 424 U.S. 392,

96 S.Ct. 948 (1976).  Further, there can be no consent by implication or by use of ambiguous

language.  Library of Congress v. Shaw, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963 (1986); United

States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351-52 (1980)(waiver of sovereign

immunity may not be found in the absence of unequivocally expressed Congressional intent.)

In the case of actions sounding in tort, however, Congress has expressly issued a limited

waiver of sovereign immunity in the Federal Tort Claims Act, 28 U.S.C. §§ 1346 2671, *et seq.*

Livera v. First National State Bank of New Jersey, 879 F.2d 1186, 1194 (3rd Cir), cert. denied sub

nom, Livera v. United States Small Business Ass'n, 493 U.S. 937, 110 S.Ct. 332 (1989); Matsko,

372 F. 3d at 558; Gotha, 115 F.3d at 179.  This is the only waiver of sovereign immunity for

actions sounding in tort against the United States, and it must be strictly construed, and all doubt

is to be resolved in favor of the government.  Meyer, 510 U.S. at 474-75, 114 S.Ct. at 1000-01.

Further, limitations placed upon the waiver are to be expansively reviewed, and only express

exceptions to these limits may be recognized.  U.S. v. Nordic Village, Inc., 503 U.S. 30, 112

S.Ct. 1011 (1992); Bowen v. City of New York, 476 U.S. 467, 106 S.Ct. 2022 (1986); Block v.

North Dakota, ex rel. University and School Lands, 461 U.S. 273, 103 S.Ct. 1811 (1983);

Soriano v. U.S., 352 U.S. 270, 77 S.Ct. 269 (1957); U.S. v. King, 395 U.S. 1, 89 S.Ct. 1501

(1969). Thus, if any limitations upon this waiver of sovereign immunity apply, then a 12(b)(1)

Motion to Dismiss for Lack of Jurisdiction over the Subject Matter is the appropriate means for

disposal of the action against the United States.  Matsko, 372 F. 3d at 558(The district court may

only exercise jurisdiction if the FTCA waives sovereign immunity).

### 2.    Plaintiff Did Not Exhaust His Administrative Tort Claim Prior to Filing this Action, As Is Required By Statute.

Plaintiff's claim against the United States, filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2675, et seq.,(hereinafter "FTCA") should be dismissed for lack of subject matter jurisdiction, because Plaintiff did not fully exhaust his administrative remedies under the FTCA **prior** to the filing of the complaint in this civil action.  28 U.S.C. § 2675(a).

As was discussed above, it has long been recognized that the FTCA represents a limited qualified waiver of sovereign immunity.  The FTCA permits an action against the United States for the alleged wrongful acts or omissions of government employees; suit under the FTCA provides the exclusive remedy for negligent conduct by federal employees.  28 U.S.C. § 2679. Any action under the FTCA requires scrupulous adherence to the Act's terms and procedural requirements, e.g., prior presentation and denial of an administrative claim.

In  28 U.S.C. § 2675(a), Congress specifically provides:

(a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, **unless the claimant shall have first presented the claim to the appropriate Federal agency and his claims shall have been finally denied by the agency in writing** (emphasis added).

In requiring the filing and denial of an administrative claim, Congress intended to "ease court congestion and avoid unnecessary litigation, while making it possible for the government to expedite the fair settlement of tort claims asserted against the United States.  S.Rept.No. 1327, 89 Cong., 2d Sess. 6, reprinted in (1966) 2 U.S. Code Cong. & Admin. News, 2515, 2516; McNeil v. United States, 508 U.S. 106, 112 n.8 (1993).

These provisions are clear and mandatory. McNeil, 508 U.S. at 111-13; Wujick v. Dale & Dale, Inc., 43 F.3d 790, 793-94 (3d Cir. 1994)(noting that administrative exhaustion under FTCA is mandatory and the Supreme Court "firmly rejected" the "no harm, no foul" reasoning); Melo v. United States, 505 F.2d 1026, 1028 (8th Cir. 1974); Bialowas v. United States, 443 F.2d 1047, 1049 (3d Cir. 1971) (requiring a claim be submitted to and finally denied by the appropriate federal agency before filing a lawsuit); Wilder v. Luzinski, 123 F.Supp.2d 312, 313-14 (E.D.Pa. 2000).

Because the FTCA represents a conditional limited waiver of sovereign immunity, the statutory requirements respecting presentation and final denial of an administrative claim are jurisdictional and cannot be waived by representatives of the federal government. See, e.g., Livera v. First National State Bank of New Jersey, 879 F.2d 1186, 95 (3d Cir.), cert. denied, 493 U.S. 937 (1989); Bradley v. United States, 856 F.2d 575, 577-79 (3d Cir. 1988), vac'd on other gds., 490 U.S. 1002 (1989), on remand, 875 F.2d 65 (3d Cir. 1989); Bialowas, 443 F.2d at 1048-49. Thus, if a plaintiff files suit without first having submitted a timely claim for administrative adjustment, the suit must be dismissed. McNeil, 508 U.S. at 112-13.

In this case, Plaintiff filed the complaint in this civil action with this Court on June 3, 2005. See Docket No. 3. At that time, Plaintiff did not allege a negligence claim with respect to the conditions in the UNICOR factory, and had submitted no administrative tort claims relating to the those allegations.[14] Id. Furthermore, he has made no attempted to resolve this matter

---

[14] Additionally, the period of time in which Plaintiff could have filed an administrative tort claim with respect to the allegations in Count Two of the Amended Complaint has now expired. Title 28 U.S.C. § 2401(b) requires all administrative claims to be filed within two years of the underlying conduct. Any ensuing appeal of that claim to the District Court would then have to be filed within 6 months after the administrative claim was denied. 28 U.S.C. § 2401(b)

administratively since that time. <u>See</u> Declaration of Joyce Horikawa ¶¶ 3-4; Declaration of Lynnell Cox¶ 4.

Plaintiff raised the negligence claim for the first time in the Amended Complaint, filed over a year after this action was commenced. At that time, and through the present, there remains no evidence that he attempted in any way to exhaust his Administrative Remedies pursuant to the FTCA.

Therefore, because Plaintiff did not exhaust his available administrative remedies under the FTCA, this Court lacks subject matter jurisdiction over the FTCA portion of this lawsuit.[15] 28 U.S.C. § 2675(a); <u>McNeil</u>, <u>supra</u>. Thus, the Second Count of Plaintiff's Second Amended Complaint must be dismissed.

>   **3.    Plaintiff's Claim Against the United States Is Barred by the Prison Industries Fund, 18 U.S.C. § 4126(c)(4), Which Provides Procedures for Compensating Inmates Who Have Been Injured at Their Institution Work Assignment.**

It is now well settled that the exclusive remedy for any injury suffered by an inmate during the course of his work assignment is the Inmate Accident Compensation system, 18 U.S.C. § 4126(c)(4). <u>U.S. v. Demko</u>, 385 U.S. 149, 151-52, 87 S.Ct. 382, 384 (1966); <u>Joyce v.

---

Records reflect that Plaintiff was finally and permanently removed from UNICOR on August 24, 2004; and was transferred from FCI McKean to FCI Petersburg at that time. <u>See</u> Declaration of Martin Sapko ¶ 6, and Attachment B; Declaration of Douglas S. Goldring ¶ 4, and Attachment B. As such, Plaintiff must have filed an administrative claim on or before August 24, 2006.

[15] Even if Plaintiff were to file an administrative claim now, this defect could not be cured. <u>Duplan v. Harper</u>, 188 F. 3d 1195 (10th Cir. 1999); <u>Gaerman v. FBI</u>, 2003 WL 23537963 (D. Or. 1995); <u>Webster v. U.S.</u>, 2005 WL 3031154 (E.D. Cal. 2005); <u>Sparrow v. US Postal Service</u>, 825 F.Supp. 252, 254-55 (E.D.Cal. 1993).

United States, 474 F.2d 215, 219 (3rd Cir. 1973)(discussing the same issue with respect to the

analogous FECA statute); Vaccaro v. Dobre, 81 F.3d 854, 857 (9th Cir. 1996)(Demko establishes

that 18 U.S.C. § 4126 is the exclusive remedy against the government); Aston v. U.S., 625 F.2d

1210, 1211 (5th Cir. 1980)(citing Demko); Granade v. U.S., 356 F.2d 837, 840-41 (2nd Cir.), cert.

denied 385 U.S. 1012, 87 S.Ct. 720 (1967).   Thus, the FTCA's waiver of sovereign immunity

does not and cannot extend to actions relating to an injury suffered by an inmate during the

course of performing his institution work assignment.  Demko, 385 U.S. at 151-52, 87 S.Ct. at

384.

Therefore, if Plaintiff's allegations indicate that his injury was incurred while working,

then this Court must dismiss the Complaint for lack of Subject Matter Jurisdiction.  Demko, 385

U.S. at 153, 87 S.Ct. at 385; Premachandra v. U.S., 739 F.2d 392, 394 (8th Cir. 1984)(a precisely

drawn, detailed statute pre-empts more general remedies); Aston, 625 F.2d at 1211 (where an

inmate was injured "on the job", the district court lacks jurisdiction to hear a cause of action

grounded on the Federal Tort Claims Act); Wooten v. United States, 825 F.2d 1039, 1044 (6th

Cir. 1987)(whether Plaintiff's injuries were caused by the performance of work is irrelevant; as

long as the injury occurred while the inmate was on the job, section 4126 is the exclusive

remedy.)

In the present case, it is clear from the face of the complaint that Plaintiff was "on the

job".  To be sure, the very heart of Plaintiff's complaint is centered upon the conditions at his

UNICOR work assignment.  Notably, Plaintiff does not allege he has been exposed to unsafe

conditions anywhere else within the prison, or in any other prison.  His allegation is solely that

the air quality in the FPI factory was unsafe.   Therefore, it is impossible to conclude that

Plaintiff's FTCA claim refers to anything other than the conditions at his institution work

assignment; precisely the type of claim covered by section 4126. Thus, the allegations raised

pursuant to the FTCA must be dismissed because section 4126 is Plaintiff's exclusive remedy

against the United States.

## IV.    <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Defendants respectfully request that the Court

grant Defendants' Motion to Dismiss Plaintiff's Amended Complaint, or in the Alternative, for

Summary Judgment.


Respectfully Submitted,

MARY BETH BUCHANAN
United States Attorney


<u>S/ Albert W. Schollaert</u>
ALBERT W. SCHOLLAERT
Assistant United States Attorney
Western District of Pennsylvania
U.S. Post Office and Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
PA ID NO. 23629

OF COUNSEL:
Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534