IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNY HILL, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 05-160E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | | |
|---|---|---|
| MICHAEL HILL, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-323E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | | |
|---|---|---|
| LESLIE KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-368E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | | |
|---|---|---|
| KEVIN SIGGERS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 03-355E |
| | ) | |
| v. | ) | JUDGE McLAUGHLIN |
| | ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., | ) | |
| | ) | (Electronic Filing) |
| Defendants. | ) | |

| | |
|---|---|
| MYRON WARD, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO. 04-11E |
| ) | |
| v. ) | JUDGE McLAUGHLIN |
| ) | MAGISTRATE JUDGE BAXTER |
| JOHN LAMANNA, et al., ) | |
| ) | (Electronic Filing) |
| Defendants. ) | |

### DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE MOTION TO DISMISS

AND NOW, come the Defendants, John LaManna, Martin Sapko, Debora Forsyth, Stephen Housler, Robert Klark, Robert Reome, and Beth Fantaskey (hereinafter collectively referred to as "Defendants") by and through their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, Michael C. Colville, Assistant United States Attorney for said district, and Douglas S. Goldring, Assistant General Counsel for Federal Prison Industries, Inc., and respectfully submit this Reply Brief in Support of their previously filed Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

Defendants filed said Motion on February 2, 2007. In response, Plaintiffs have filed a responsive brief suggesting that these collective cases should not be dismissed. (Dkt. No. 111). While Plaintiff's response is extremely creative, it consists of nothing more than slight of hand, deception, and misdirection, and bears no actual relationship to the facts in this case. With this façade stripped away, however, it becomes clear from Plaintiffs' brief that there is simply no evidence, facts, or circumstances, which would enable them to satisfy their burden of proof in this case. <u>Helling v. McKinney</u>, 509 U.S. 25 (1993) (In order for Defendants to be denied the protection of Qualified Immunity in this case, <u>Plaintiffs bear the overwhelming burden</u> of

demonstrating to the Court that: 1) a hazardous condition existed in the UNICOR factory; 2) that the individual Defendants each knew of the hazardous condition, and 3) that the individual defendants were each deliberately indifferent to such a condition.); Zeigler v. Jackson, 716 F.2d 847 (11th Cir. 1983) (The <u>Plaintiffs</u> have the burden of showing that the defendant federal employees violated his clearly established Constitutional rights.).  As such, the Defendants are entitled to have this case dismissed pursuant to the Doctrine of Qualified Immunity.

In order to attempt to convince the Court that they can satisfy this burden, however, Plaintiffs have misrepresented the clear evidence in this case in order to fit the round pegs of evidence into the square holes of their allegations.  Defendants were not fooled by this illusion, and neither should the Court.

In their brief, for example, Plaintiffs rely upon page 18 of Defendant Housler's deposition to support their contention that, "the ventilation system at FCI McKean's UNICOR facility did not prevent silica dust in significant amounts to become airborne." Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, page 3.  In fact, on page 18 of his deposition, Defendant Housler testified to the exact opposite proposition, that there was an insignificant amount of dust in the air, which was more than adequately handled by the dust collection system in place at that time.  <u>See</u> Deposition of Stephen Housler, page 18. Specifically, the following exchange took place:

> Q: And you had observed those cutting and sawing operations of Micore Board prior to the OSHA inspection, I presume?
>
> A: Right, yes.
>
> Q: So you knew that that Micore Board generated some amount of dust?
>
> A: Some dust, yes.

3

> Q: All right.
>
> A: But that dust was taken care of with our ventilation and our system that collect – collects dust.
>
> Q: Well, when an inmate would use, let's say, a table saw –
>
> A: Right.
>
> Q: -- with a piece of Micore Board or one or more pieces of Micore Board, and they would push that Micore Board through that saw, not all of the dust would go into the ventilation system, would it?
>
> A: Majority of the dust would enter the dust-collecting system. Yes it did.
>
> Q: Okay. But not all of it.
>
> A: Not all of it. No.
>
> Q: And, in fact, did you observe that after the operation of a saw, there would be dust in and around the area of operation of the saw?
>
> A: There would be a small amount, yes.

See Deposition of Stephen Housler, page 18 (emphasis added). This testimony is in direct contradiction to the statement carelessly attributed to Defendant Housler in Plaintiffs' brief. In fact, Defendant Housler's Deposition testimony is consistent with the findings of Brendan Claybaugh, the OSHA Safety and Compliance Inspector who conducted the April thru August 2003 investigation. It is also supported by the deposition and declaratory testimony of all of the Defendants, and several uninterested staff members; the video which was filmed by Mr. Claybaugh as part of his investigation of the UNICOR factory; and the opinion and report of an independent certified industrial hygienist, Deitrich Weyel. All of this evidence directly contradicts Plaintiffs' assertion that the air in the factory contained anything more than an

insignificant amount of dust. [1]

Likewise, Plaintiffs further argue that the quality of the air during the period of time in question was not representative of the conditions in the factory overall. In fact, they argue, the period of time from April through June 2003, represents an unusually low period of production. They contrast this with October 2003, when over 800 boards were processed. Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, pages 4, 11 and Attachment A. [2]

A closer inspection of Attachment A, which is the production records from the UNICOR factory at FCI McKean, shows that it not only fails to support their contention, it actually refutes Plaintiffs' allegations. Plaintiffs' Attachment A shows that over the 63 month period from October 2000 through December 2005, the factory processed 8645.55 boards. This is an average production of 137.23 boards per month. This clearly shows that the periods of time during which the air quality tests were conducted were at or near the levels of an average production month.

---

[1] Plaintiffs further contends that the record, "contains evidence that the Material Safety Data Sheet ('MSDS') maintained by the Defendants with regard to the Micore fiber board was altered by hand." Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, page 13. Plaintiffs, however, provide no reference to any such evidence. In fact, the only evidence linking any unauthorized marks on an MSDS sheet to the Defendants is Plaintiffs' self serving speculation. Through their declarations and depositions, all of the Defendants have testified that they had no knowledge as to how the MSDS sheet was altered. See, e.g Declaration of Martin Sapko ¶ 13; Declaration of Stephen Housler ¶¶ 43-45; Declaration of Debora Forsyth ¶ 9.

[2] Plaintiffs again attempt to paint the picture that the air in the factory was thick with dust, and that inmates left the factory covered from head to toe with silica dust, as though they were coal miners at the turn of the 20th century. Although extremely creative, there is simply no evidence to support this fabrication. As was clearly shown in the video recorded by Brendan Claybaugh as part of his inspection, the factory had exceptionally clean air. In fact, the video documented a complete lack of dust on the hair, clothing, and skin of any of the inmates; and an insignificant amount of dust on the floor, sills, and equipment. See Declaration of Brendan M. Claybaugh, ¶ 7, and Attachment C.

See Plaintiffs' Attachment A.  October 2003, however, which Plaintiffs choose as their comparison, represents an abnormally high production month.  See Attachment A.  In fact, the production levels on October 2003 were so excessive that the next three highest production months are not even close to the level of production, at 576 boards (October 2005), 440 boards (October 2001), and 404 boards (September 2004).  Thus, October 2003 represents a period of time which is almost twice the level of the next highest month of production, and nearly eight times the average monthly production level of the factory.  See Plaintiff's Attachment A.

      In fact, a closer inspection of Plaintiffs' Attachment A reveals the following:

           Of the 63 months in question, over half (36 months) were at or below the average production level of 137.23 boards;

           In 13 of the 63 months, production dropped to 25 or fewer board; with zero boards processed for six of those months.

      Furthermore, in direct contradiction of Plaintiff's argument, Attachment A indicates that production rose higher than 200 boards in only eleven months, only seven of which were over 300 boards.  Likewise, production rose over 500 boards on only two occasions, including October 2003, which Plaintiffs would have the Court believe was representative of the overall production levels of the factory.  See Plaintiff's Attachment A.

      It is also important at this time to note the uncontested report of Deitrich Weyel, ScD, CIH, who stated that the number of boards cut would have no effect on the amount of dust generated.  As such, regardless of whether the factory processed eight boards or 800, the measurement of dust in the air would remain constant as long as the dust collection system was

operational. ₃

    Dr. Weyel went on to state his opinion to a reasonable degree of scientific certainty that:

> the F.C.I. facility was a safe working environment. During the relevant period of time the staff took necessary and appropriate measures to insure a safe and hazard free working environment. The air quality was, at all relevant times, well within the applicable OSHA standards. Two independent studies and other documentation show that the UNICOR factory was a safe and clean work place. The ventilation systems were regularly inspected and well maintained. There certainly were no unreasonable hazards in the working environment.

Report of Deitrich Weyel, ScD, CIH. Dr. Weyel's expert opinion has not been refuted or contradicted by Plaintiffs. In fact, they have submitted no opinion of any industrial hygienist with their response. As such, the Court must accept as true the undisputed testimony of the only industrial hygienist to submit testimony in this case. Flanagan v. Labe, 666 A.2d at 335(emphasis in original)(quoting Mitzelfelt v. Kamrin, 584 A.2d at 892). See also Joyce v. Boulevard Physical Therapy & Rehabilitation Center, P.C., 694 A.2d 648, 654 & n.3 (Pa. Super. 1997); Maurer v. Trustees of the University of Pennsylvania, 614 A.2d 754, 757-58 (Pa. Super. 1992)(en banc)(citing cases). See also Gindraw v. Dendler, 967 F.Supp 833 (E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584 A.2d 888, 892 (1990).

    In Callahan v. Cho, 437 F. Supp. 2d 557 (E.D. Va. 2006), Plaintiff filed a medical malpractice case against Dr. Cho. There, as in the present case, Defendant submitted expert testimony to support his position. Again, as in the present case, Plaintiff submitted only lay testimony to refute the position of Dr. Cho's expert witness. The Court held that this lay testimony, when used to rebut the testimony of a qualified expert, was, "insufficient to establish a genuine issue of material fact." Callahan v. Cho, 437 F. Supp. 2d at 565.

---

[3] Plaintiffs have submitted no evidence to refute the declaration of Mike Salerno, who testified that the dust collection system was rated at twice the requisite capacity for the factory, and was fully operational at all times. See Declaration of Michael Salerno ¶¶ 8-11.

Similarly, in <u>Jones v. Toyota Motor Sales, USA, Inc (Toyota)</u>, 94 Fed. Appx. 879 (3rd Cir. 2003), Plaintiff filed a product liability claim against Toyota, alleging that he was injured while operating a tow motor manufactured by Toyota. Like the Defendants in the present case, Toyota filed a Motion for Summary Judgment, in which they presented the opinions of two engineering experts. <u>Id.</u> at 881. In response, Jones, like the Plaintiffs in the present case, presented no affidavits, evidence, or expert reports. He submitted only a brief opposing the motion. The Court in Jones properly held that the Plaintiff's failure to produce expert evidence to rebut Defendant's expert opinions was, "fatal to his case." <u>Id.</u> at 882 (emphasis added). <u>See also</u> <u>Gans v. Mundy</u>, 762 F.2d 338, 343 (3rd Cir. 1985)(upholding the grant of summary judgement in favor of the defendants where the plaintiff failed to produce expert testimony).

Likewise, in the present case, Defendants have produced expert testimony in the form of an opinion rendered by a certified industrial hygienist. Nonetheless, the only evidence which Plaintiffs have submitted to rebut this evidence are their own self serving statements relating to the conditions in the factory. They have provided no air quality tests, no scientific data, no documentary evidence or testimony of any unbiased witnesses to support their position, and most importantly, no expert testimony of any kind.[4] In fact, they do not even refute Dr. Weyel's conclusion. As such, in light of the significant weight which must be given to undisputed expert testimony, it is clear that no set of facts or circumstances would allow a reasonable fact finder to

---

[4] Plaintiffs would have this Court believe that their lack of evidence was somehow related to the conversion of the McKean factory from a wood working factory to a plastics factory. Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, pages 11-12. This ludicrous assertion is completely without merit. This case has been pending for several years, yet their responsive brief to this third round of dispositive motions is the first time Plaintiffs have ever expressed a desire to inspect the factory. They allege that the factory conversion has precluded their industrial hygienist from conducting air sampling tests, yet they have given no indication that they have even hired an industrial hygienist. Furthermore, as has been repeatedly represented to Plaintiffs, one of the two dust collectors is still present in the factory and available for inspection by the Plaintiffs. It is clear that this spoliation argument is nothing more than yet another effort by the Plaintiffs to create illusory issues which are completely irrelevant to the task at hand, and are designed solely to distract the Court from the fact that there is simply no evidence which supports Plaintiffs' untenable position in this case.

rule in favor of Plaintiffs.  Callahan , 437 F. Supp. 2d at 565; Jones, 94 Fed. Appx. at 881-82; Gans, 762 F.2d at 343.

Plaintiffs also attempt to mischaracterize and minimize the reports of Defendants' second expert witness in this case, Dr. Gregory Fino.  Dr. Fino concluded that the results of Plaintiffs' lung function tests were simply incompatible with their physical capabilities.  To be sure, their lung function tests each indicated that Plaintiffs should have been completely incapacitated.  Nonetheless, at the time of their examination, all of the Plaintiffs were able to walk unassisted and speak normally.  In fact, Plaintiff Michael Hill arrived at his examination in a cast as a result of an injury he obtained playing basketball.  These actions are all simply not consistent with the supposed results of the lung function tests administered to Plaintiffs.  As such, Dr. Fino determined the results of the lung function tests to be invalid.  See Report of Gregory Fino, M.D. FCCP.

Likewise, Plaintiffs present no medical evidence of their own.  They state only that they have retained a medical expert, but give no indication that a report is even forthcoming.  Instead, they again provide only their own self-serving opinions to rebut Dr. Fino's conclusions that there were, "no pleural and no parenchymal abnormalities consistent with occupationally acquired pneumoconiosis in any of the five Plaintiffs."[5]  See Reports of Gregory J. Fino, M.D., FAACP.  Plaintiffs' self serving lay testimony, however, when used to rebut the testimony of a qualified expert is, "insufficient to establish a genuine issue of material fact."  Callahan , 437 F. Supp. 2d

---

[5] Likewise, Dr. Fino further concluded that none of the Plaintiffs showed any evidence of either chronic or acute silicosis.  He went on to state that these five individuals, "should have no fear of contracting silicosis in the future."  He based this conclusion on his examination, as well as medical literature, which indicates that in order for chronic silicosis to occur, an individual must be exposed to dust that is measurable and above the PEL for a period in excess of 20 years.  See Reports of Gregory J. Fino, MD, FCCP.

at 565; Jones, 94 Fed. Appx. at 881-82; Gans, 762 F.2d at 343.  See also Flanagan v. Labe, 666 A.2d at 335(emphasis in original)(quoting Mitzelfelt v. Kamrin, 584 A.2d at 892). See also Joyce v. Boulevard Physical Therapy & Rehabilitation Center, P.C., 694 A.2d 648, 654 & n.3 (Pa. Super. 1997); Maurer v. Trustees of the University of Pennsylvania, 614 A.2d 754, 757-58 (Pa. Super. 1992)(en banc)(citing cases). See also Gindraw v. Dendler, 967 F.Supp 833 (E.D.Pa. 1997) (quoting, Mitzelfelt v. Kamrin, 526 Pa. 54,62, 584 A.2d 888, 892 (1990).

     Finally, Plaintiff contends that the record establishes a claim against Defendants Forsyth and LaManna.  In support of this claim, however, Plaintiffs allege solely that Defendants Forsyth and LaManna directly or indirectly supervised other Defendants.  Plaintiffs' Brief In Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment, pages 19-21.

     It is well settled, however, that the doctrine of respondeat superior cannot form the basis of a Bivens claim. Robertson v. Sichel, 127 U.S. 507, 515-17 (1988); Rizzo v. Goode, 423 U.S. 362, 371 (1976).  Supervisory personnel are generally not liable in a civil rights action under the theory of vicarious liability.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.) (en banc), cert. denied, 502 U.S. 1074 (1992); Hansen v. Black, 885 F.2d 642, 645-646 (9th Cir. 1989); See also Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991).  To find a supervisory official personally liable for the unconstitutional acts of his subordinates, it must be shown that the supervisor had a duty to instruct the subordinate to prevent constitutional harm, and that "as a result of the official's failure to instruct, the Plaintiff was harmed in the manner threatened." Haynesworth v. Miller, 820 F.2d 1245, 1262 (D.C. Cir. 1987); MacKinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995); Redman, 942 F.2d at 1446-1447; Hansen, 885 F.2d at 646; See also Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in

10

the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others.); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (inmate fails to allege any facts showing role head of state department of corrections played in denial of dental care); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam) (warden's responsibility for generally supervising the operations of the prison not sufficient to establish personal involvement). Therefore, personal involvement or some affirmative action on the part of a Defendant is necessary before he may be found liable for a civil rights violation. See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Stoneking v. Bradford Area School District, 882 F.2d 720, 729-30 (3d Cir.), cert. denied, 493 U.S. 1044 (1990).

    A sufficient causal connection may be established by showing that the supervisor set in motion a series of acts by others which the supervisor knew or reasonably should have known would cause others to inflict the injury. Larez, 946 F.2d at 645; Redman, 942 F.2d at 1447. A supervisor may also be liable for constitutional violations by his subordinates if the supervisor knew of the violations and failed to prevent them. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 680-81 (9th Cir. 1984). Finally, supervisors may be liable if the alleged deprivation resulted from a failure to properly train or supervise personnel, or from an official policy or custom for which the defendants were responsible. Ybarra, 723 F.2d at 680. As such, Plaintiffs' claims that Defendants Forsyth and LaManna were simply in supervisory roles are clearly insufficient to impose liability in this

case. [6]

WHEREFORE, for the reasons stated above, Defendants' <u>Motion For Summary Judgment</u> should be granted with a certification that any appeal would be deemed frivolous, lacking in probable cause, and not taken in good faith.

        Respectfully submitted,

        MARY BETH BUCHANAN
        United States Attorney

        <u>/s/ Michael C. Colville</u>
        MICHAEL C. COLVILLE
        Assistant U.S. Attorney
        Western District of PA
        U.S. Post Office & Courthouse
        700 Grant Street, Suite 4000
        Pittsburgh, PA 15219
        (412) 894-7337
        PA ID No. 56668

OF COUNSEL:
Douglas S. Goldring
Assistant General Counsel
Federal Prison Industries (UNICOR)
400 First Street, NW, 8th Floor
Washington, DC 20534

---

[6] Defendants also urged the dismissal of Defendants Fantaskey, Reome, and Klark.  Upon completing discovery, Plaintiffs have conceded that there is no basis upon which to impose liability upon these Defendants.  Although footnote 2 of their brief indicates that Plaintiffs, "do contest Defendants' motion as to Defendants Reome, Fantaskey, and Klark," Defendants' counsel has confirmed with Plaintiffs' counsel that this language contained a typographical error by omitting the word, "not".  Nonetheless,  Plaintiffs clearly intended to cease pursuit of any claims against those three Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2007, a true and correct copy of the within **DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION TO DISMISS** was served, by either electronic means or by postage paid U.S. Mail, to and upon the following:

Richard A. Lanzillo, Esquire
Knox McLaughlin Gornall & Sennett, P.C.
120 West Tenth Street
Erie, PA 16501-1461


 /s/ Michael C. Colville
MICHAEL C. COLVILLE
Assistant U.S. Attorney