IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL HILL, et al.,
           Plaintiffs

        v.

JOHN LAMANNA, et al.,
           Defendants

)
)  CIVIL ACTION NO. 03-323 ERIE
)  CIVIL ACTION NO. 03-355 ERIE
)  CIVIL ACTION NO. 03-368 ERIE
)  CIVIL ACTION NO. 04-11  ERIE
)  CIVIL ACTION NO. 05-160 ERIE
)


## STATUS CONFERENCE


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers, U.S. Courthouse, Erie,

Pennsylvania, on Friday, March 9, 2007.


APPEARANCES:

    NEAL R. DEVLIN, Esquire, (via Phone), appearing
    on behalf of the Plaintiffs.

    MICHAEL C. COLVILLE, Assistant United States
    Attorney, (via Phone), appearing on behalf of
    the Defendants.

    DOUGLAS S. GOLDRING, Assistant General Counsel,
    (via Phone), appearing on behalf of the Federal
    Bureau of Prisons.


Ronald J. Bench, RMR - Official Court Reporter

1                   <u>P R O C E E D I N G S</u>

2

3        (Whereupon, the proceedings began at 11:00 a.m., on

4  Friday, March 9, 2007, in Judge's Chambers.)

5

6        MR. COLVILLE:  Mike Colville, let me patch everybody

7  in here.  Your Honor?

8        THE COURT:  I'm here.

9        MR. COLVILLE:  We have Doug Goldring, your Honor,

10  counsel for the Bureau of Prisons.

11        THE COURT:  Do we have Rich Lanzillo on the line?

12        MR. DEVLIN:  This is Neal Devlin.  Unfortunately,

13  Mr. Lanzillo is actually in the prison meeting with Michael

14  Hill, one of the clients.  Since our clients have been

15  transferred to Erie, we no longer have to have conference calls

16  with him.  He had hoped to meet with Michael Hill in an

17  attempt, quite frankly, to see if there was any possibility of

18  settling at the least the dental side of the claim.  He had

19  hoped to get back.  He must be detained in prison, your

20  Honor -- Mr. Lanzillo is not here.

21        THE COURT:  Look it, I have gone through and

22  reviewed all of the objections and rather carefully have

23  reviewed this file.  I just in no particular order of

24  importance want to raise some issues here.  The first issue

25  involves the dental claim.  I guess this would be directed to

1  Mr. Devlin. Do I have it right or is my recollection of the

2  record accurate that in connection with his exhaustion of his

3  FTCA dental claim, that he made a monetary demand of $10,000?

4  　　　　　MR. DEVLIN: That's correct, your Honor.

5  　　　　　THE COURT: And would my assumption be correct that

6  under the statute, that by virtue of having made that demand,

7  he has locked himself into that damage claim?

8  　　　　　MR. DEVLIN: Your Honor, we have not fully analyzed

9  that, we believe you are correct.

10  　　　　　MR. GOLDRING: That's correct, your Honor.

11  　　　　　THE COURT: Well, I simply raise it, I have not yet

12  ruled on the objections to the magistrate judge's denial of the

13  summary judgment motion insofar as the negligence claims are

14  concerned. I will tell you quite candidly I think it is more

15  likely than not that that claim is going to go forward. But

16  that said, I wanted to make sure everybody was on the same page

17  of the damage aspect of it. Because that might go a long way

18  toward -- let's go off the record here for a second.

19  　　　　　(Discussion held off the record.)

20  　　　　　THE COURT: Let's go back on the record now. I am

21  now shifting gears on to the silica part of these cases. This

22  question is directed to Mr. Devlin. My review of the record

23  indicates that while we have the reports of Dr. Fino, F-i-n-o,

24  we never did receive any expert medical reports, counter expert

25  medical reports or for that matter any medical reports at all

1   filed by the plaintiffs.  My question to you is -- had you

2   retained a medical expert and had you intended to file a report

3   or reports or not?

4          MR. DEVLIN:  Your Honor, we did retain a medical

5   expert.  We forwarded to the medical expert all the records.

6   The medical expert indicated he required to see film.  We then

7   coordinated with counsel for the defendant, who was to get the

8   films that were taken during the IMEs of the plaintiffs.  We

9   got those down to our medical expert, quite frankly, after we

10   filed the motion for summary judgment, and I believe it took

11   him until either the same time or shortly after the report and

12   recommendation came out.  We have been trying to contact our

13   medical expert to determine his review of those films.  And he

14   has, we have simply been unable to do that for timing reasons.

15          One more issue on that, your Honor.  It is with

16   respect to Kevin Siggers, I believe we made reference to this

17   at least in our summary judgment papers, if not in the

18   objection.  Mr. Siggers has been released from prison.  He's in

19   the Cleveland, Ohio area now.  He has actually been admitted to

20   the hospital for certain problems, lesions were being found in

21   his throat and part of his respiratory tract.  The timing on

22   this is unfortunate because we have not been able to get any

23   diagnosis from the doctors.  What we are told is that they

24   don't even know what's wrong with him, much less what's causing

25   what's wrong with him.  I believe he had some surgery last week

1   and a biopsy on some lesions to try and get a handle on what's

2   the matter.  Your Honor's rendition of the record is accurate.

3   We have not filed a medical report.  We are not in possession

4   of a medical report at this point in time.  Which I do believe

5   is consistent with the magistrate judge's report and

6   recommendation, that's not fatal to our claim.  But your Honor

7   is factually correct on the record.

8          THE COURT:  All right.  Given the nature of the

9   disposition of the magistrate judge, it wasn't fatal to your

10  claim?

11         MR. DEVLIN:  Correct, other things were.

12         THE COURT:  Other things were, that wasn't.  So the

13  record is clear, though, I think you made it clear, Mr. Devlin,

14  it's accurate to say that you do not presently have in your

15  possession an expert report or reports relative to any of these

16  plaintiffs that diagnosis a silica related condition that is

17  caused by their exposure to silica dust while working at the

18  UNICOR facility?

19         MR. DEVLIN:  We do not have that presently, that's

20  correct, your Honor.

21         THE COURT:  And I suppose it would also be accurate

22  to say as you sit here today, you have no reasonable

23  expectation that you're going to receive such a report at any

24  time in the immediate future?

25         MR. DEVLIN:  Your Honor, I would say that is

accurate with respect to all plaintiffs except Mr. Siggers.
Our problem with Mr. Siggers is, your Honor simply one that
medical professionals don't know what's wrong with him.  On a
day-to-day basis we try to keep in contact as we can with the
doctors, although, at times it's difficult.  We just don't know
when they're going to let us know what's wrong.  We don't know
if what's wrong with him has anything to do with silica dust or
not, to be quite frank with your Honor.  But it's just what's
been described to us as his problem, you know the medical
professionals say they cannot rule out anything at this point.
So with respect to Mr. Siggers, we have no idea when we will
learn what's wrong with him.  With respect to the other
plaintiffs, we agree with your Honor we do not anticipate
receiving any more reports in the near future.

THE COURT:  All right.  Now, let me raise another
issue that was raised in the objection.  Actually, it was a
little more front and center in the objections than it really
was in the plaintiffs' brief in opposition to defendants'
motion for summary judgment.  That is the spoliation argument?

MR. DEVLIN:  Yes, your Honor.

THE COURT:  I took a look, I went back and took a
look at some of the case law on this.  Interestingly enough,
maybe not interestingly -- but one of the cases that I looked
at, Brewer v. Quaker State, was a case many years ago I got
reversed on, but not on this point.  The circuit was talking

1  about that doctrine -- let me just quote it and then I'll ask

2  my questions, it's really a record question.  The circuit says

3  relative to the issue.  "Further, it must appear that there has

4  been an actual suppression or withholding of the evidence.  No

5  unfavorable inference arises when the circumstances indicate

6  that the document or article in question has been lost or

7  accidentally destroyed, or where the failure to produce it is

8  otherwise properly accounted for."  Citing C.J.S. Evidence

9  sections, etc.  Then the quote goes on, "such a presumption or

10  inference arises, however, only when the spoliation or

11  destruction of evidence was intentional, and indicates fraud

12  and a desire to suppress the truth, and it does not arise where

13  the destruction was a matter of routine with no fraudulent

14  intent."

15          Now, I'm going to swing over to Mr. Colville here

16  or, I apologize, who is the other counsel I have?

17          MR. GOLDRING:  Mr. Goldring, your Honor.

18          THE COURT:  Mr. Goldring.  What if anything does the

19  record tell me as to the reason or reasons for or when the

20  decision was made for the conversion of the UNICOR facility

21  from a particleboard facility to whatever it ultimately was

22  turned into; that would have occurred in January of 2006, is

23  that right?

24          MR. GOLDRING:  Your Honor, this is Mr. Goldring.  I

25  believe this was discussed at Mr. Sapko and Mr. Housler's

1    deposition.  And I don't recall off the top of my head exactly

2    when the decision was made.  The decision was essentially made

3    in the way the materials were being shipped back and forth.  It

4    just wasn't making sense to do these things at McKean anymore.

5    It wasn't making financial sense.  It wasn't making sense from

6    a business standpoint.  So the decision was made, I believe it

7    was somewhere in 2004.  In 2004 they were going to start

8    looking at shifting those operations down to the Coleman

9    factory.  Which was just a better shipping route for where the

10   materials were coming from and where these things were

11   typically going out.  That was the main reason for starting to

12   look at conversion, it was just from a business and financial

13   operation.  It wasn't making sense to make these kinds of

14   furniture goods in the McKean factory.

15           MR. COLVILLE:  Your Honor, may I also add the

16   decision wasn't made by any of the individually named

17   defendants.  This decision was not -- it wasn't their decision.

18   They played no role in it whatsoever.

19           THE COURT:  In other words, the decision to convert

20   this factory wasn't made by any of the folks at FCI McKean, it

21   was made by higher-ups at the BOP?

22           MR. GOLDRING:  Right, was maybe corporate management

23   when they took a look at the global list of what factories were

24   doing what.  Whether a factory was being successful or not

25   successful.  That is where the decisions are made and are at

1  our corporate headquarters -- whether to close a factory or

2  open a new factory or change a factory, those kinds of

3  decisions.  Those decisions are not made at all the local

4  institution level.

5        THE COURT:  All right.  Then I guess to a certain

6  extent I'm giving everybody an opportunity to way in on this

7  one issue, I'm going to do that with Mr. Devlin now.  Mr.

8  Devlin, in your papers you suggest that the spoliation doctrine

9  should kick in and inure to your benefit.  I guess you suggest

10 that that doctrine in and of itself should have been sufficient

11 to cause you to survive summary judgment because you contend

12 the magistrate judge should have given you the benefit of an

13 inference that the level of contaminants at the facility was

14 such that it imposed an unreasonable health risk?

15       MR. DEVLIN:  It is, your Honor.

16       THE COURT:  I guess I have a number of questions on

17 that.  If the elements to make out a viable spoliation argument

18 would be essentially, and this is true I think both under

19 Pennsylvania appellate law and Third Circuit law, the degree of

20 fault of the party who altered or destroyed the evidence; the

21 degree of prejudice suffered by the opposition party; and the

22 availability of a lesser sanction that will protect the

23 opposing party's rights and deter future similar conduct.

24 That just for the record is Schroeder v. Commonwealth of

25 Pennslyvania Department of Transportation, 710 A.2d 23 PA

1   (1998).  Federal law is not dissimilar.  In this particular

2   case isn't it true, at least I think it's true, the industrial

3   hygienist who would have been retained by the defendant, whose

4   name is escaping me -- was it White or something like that?

5            MR. DEVLIN:  Weyel, I believe, your Honor.  By the

6   defendants, yes, Mr. Weyel.

7            THE COURT:  What was the date of Mr. Weyel's report,

8   does anyone know, roughly?

9            MR. COLVILLE:  I don't have that at my disposal.  It

10  was January, February.

11           MR. GOLDRING:  End of January, I think.

12           THE COURT:  Mr. Weyel generated a report without the

13  benefit of ever having toured the facility when it was working

14  as a particleboard facility, didn't he?

15           MR. COLVILLE:  Correct.

16           THE COURT:  I mean your expert, I'm talking to Mr.

17  Devlin -- your expert, Mr. Devlin, had access to the same

18  materials that Mr. Weyel had, didn't he?

19           MR. DEVLIN:  He did, your Honor.  Not to anticipate

20  the question --

21           THE COURT:  You can anticipate it, that's all right.

22           MR. DEVLIN:  Obviously, there is a difference here

23  in the burden.  We did produce an expert's report.  Our expert

24  was able to opine on a number of issues related to the OSHA

25  investigation.  Which OSHA and Microbac are the only two

1  entities that investigated this facility at the point in time

2  when it was operational, at least relevantly operational to

3  this case.  Our expert, along with Mr. Weyel, were able to

4  render opinions regarding the efficacy of that OSHA

5  investigation, whether or not it was accurate and whether or

6  not it properly described the condition.  Our expert believes

7  it did not.  Their expert believes it did.  As the magistrate

8  judge's report, quite frankly, we believe correctly indicates,

9  our burden is more than simply poking holes in the OSHA

10  investigation.  We acknowledge that we need to come forward

11  with more than that.  We believe that we have successfully

12  created an issue of fact as to whether the OSHA investigation

13  or the Microbac investigation are accurate pictures of what

14  this factory looked like from a quality air perspective back

15  when it was in operation.  Our problem comes from the fact in

16  order to sustain our burden, our expert would be required to do

17  more than what the defense experts would be.  And, namely, to

18  come forward with a quantification of the amount of hazardous

19  material, be that from silica dust or in Locwelds in the air at

20  the facility.  It's that requirement that causes the

21  disassembling, dismantling of the facility which causes major

22  prejudice to us.

23          THE COURT:  What does the defendant say to the

24  plaintiffs' spoliation argument?

25          MR. COLVILLE:  Let me chime in, Doug, as well.

1    Couple things.  One, the plaintiffs' plant was up and running I

2    think during, at least the filing of these claims.

3             MR. GOLDRING:  The plant was up and running part of

4    that.

5             MR. COLVILLE:  They had access, after they filed the

6    complaint, to have an investigation done or to get whatever

7    information they thought they needed to support their claim.

8    The other thing is we believe there's sufficient evidence that

9    still survives.  You know what the ventilation system, the

10   aspects of it are.  The potential it had, how it operated.  You

11   have a videotape from the OSHA investigation itself.

12            THE COURT:  Which showed the plant in operation on a

13   couple of days, is that right?

14            MR. COLVILLE:  Correct.  You could see what was

15   going on.  Like I said, the plant was running at a time when

16   they filed the lawsuit and were proceeding on whatever claims

17   they wanted to at that point.  And, again, I think your initial

18   statements, your Honor, with regard to impressions, our people

19   had no role in the decision to remove, to change the plant over

20   to different manufacturing.  There's no bad intent, no fraud,

21   none of the elements you mentioned earlier which rises to the

22   level of spoliation.

23            THE COURT:  Let me see if I can complete our

24   discussion, start to bring it to a close here and ask Mr.

25   Devlin this.  On the question of intent or fraud or bad faith

 1   or ill will or an attempt to conceal to avoid ramifications of

 2   a lawsuit, do you have any evidence that would suggest that

 3   this decision was made by people other than whom I am told was

 4   made here on this telephonic conference, that is the higher-ups

 5   in the BOP, and secondarily was made exclusively for business

 6   decisions based upon the apparent lack of the economic

 7   productivity of the product they were manufacturing?

 8           MR. DEVLIN:  Your Honor, as to the first question,

 9   no, we have no evidence as to who made that decision

10   whatsoever.  Whether or not the warden did, I don't know if

11   Warden Lamanna would have been the warden when the decision was

12   made or not.  Whether or not he would have had a say in it.  We

13   don't have any evidence on that.

14           As to the second point, your Honor, circumstantially

15   this goes to I believe Mr. Colville's point as well, the fact

16   that these claims are pending from 2002, we submit, your Honor,

17   doesn't hurt our spoliation claim, in fact, it makes it more

18   clearer.  The plaintiffs in the case, from both a procedural

19   perspective, could not have engaged in discovery until an

20   initial status conference, which didn't occur until after the

21   plant was dismantled.  From a practical perspective, the

22   plaintiffs in this case weren't represented until 2005, late

23   2005, after the plant was dismantled.  And as to this

24   circumstantial evidence, your Honor, regarding intent --

25           THE COURT:  Hang on a second, when you entered an

14

1   appearance in this case, it would have been December of 2005?

2           MR. DEVLIN:  Yes, your Honor.

3           THE COURT:  All right.  Let me ask Mr. Colville or

4   the representative of the BOP when was the plant dismantled?

5           MR. GOLDRING:  Right around that same time, your

6   Honor.

7           THE COURT:  Could it have been January of '06?

8           MR. GOLDRING:  I don't have the exact date, it was

9   between November, November of '05 and January of '06, I don't

10  remember the exact date.

11          THE COURT:  All right.  I sorry, Mr. Devlin, I

12  interrupted you.

13          MR. DEVLIN:  I will tell you, your Honor, the first

14  time we learned that the plant was dismantled was at the Rule

15  26 conference.  I actually have a specific recollection of Mr.

16  Goldring in Magistrate Judge Baxter's chambers indicating to me

17  that the plant was no longer in operation.  That is the first

18  time we received notice of that.  It really gets to the heart

19  of the spoliation claim, your Honor.  Had we've been given

20  notice at that point in time, where our clients, before our

21  involvement, had our clients been given notice that the plant

22  was being dismantled and had the opportunity to have an expert

23  come in and observe the plant with equipment running and to be

24  able to take actual ambient air samples and testing, we

25  wouldn't have a spoliation argument, we would have been in

1    there to protect our record.  We were not given that notice.

2    We were not informed the plant was dismantled until after it

3    occurred.  And, therefore, while there's no question a defense

4    expert has been able to opine yeah, it looks like the

5    ventilation system, everything was fine, the OSHA report is

6    good and our expert no, we don't think the ventilation system

7    necessarily was fine and we don't think the OSHA report is a

8    good report, our expert cannot take that next step and actually

9    give the court or the ultimate fact finder a number, say here

10    is the concentration of silica dust in the air at the UNICOR

11    operating at this and this capacity.  That prejudice is what

12    led to our spoliation argument and we believe lack of notice

13    circumstantially satisfies the intent prong of that test.

14           THE COURT:  Mr. Colville, were you about to say

15    something?

16           MR. COLVILLE:  No, I think the court understands our

17    point.

18           THE COURT:  Let me just make one other point.  But

19    even if an inference were to require, even if this were an

20    appropriate case for the utilization of the doctrine, the most

21    it could do for you, wouldn't this be true, Mr. Devlin, would

22    raise an inference on the question of objective

23    unreasonableness of the condition of the plant.  It would not

24    impact on the independent conclusion of the magistrate that the

25    subjective prong of <u>Farmer</u> had not been satisfied?

1           MR. DEVLIN:  I agree with that, your Honor.

2           THE COURT:  All right.  And, finally, would you

3 agree with me that assuming that the record does not reflect

4 the type of fraudulent intent to destroy evidence so as to

5 avoid potential adverse effect in the lawsuit, if you don't

6 have that prong among the three in that spoliation setting, you

7 don't really get off the ground in a spoliation argument?

8           MR. DEVLIN:  Your Honor, I would agree with that

9 with this caveat.  That we believe that the evidence here does

10 support that prong.  I agree if your Honor were to find there

11 was not the intent element on the spoliation doctrine, that the

12 failure of that prong would be detrimental to the argument.

13           THE COURT:  Let me ask Mr. Colville this and the BOP

14 representative.  Who is it, and I'm not sure it's necessary

15 that I'm going to require it, but who is it that could speak

16 conclusively to the issue as to the reason or reasons the plant

17 was dismantled and the timing of that?

18           MR. GOLDRING:  We have a central office, it would

19 have been the chief administrative officer who is typically

20 responsible for those kinds of issues.  We also have an

21 executive director who usually has information on those issues.

22 Either of them would probably be in a position to discuss with

23 the court exactly how this decision was made and who made that

24 decision.

25           THE COURT:  All right.  Only because everyone has

1    spent so much time on this case, I think appropriately so, it's

2    a big record.  But just in the interests of making sure that

3    every "i" is dotted and every "t" is crossed, I feel the

4    instinctive need to tighten up the record on this one point.

5    I'm not going to require people -- where would this individual

6    be located, where is the administrative office?

7            MR. GOLDRING:  Washington, D.C.  Your Honor, I can

8    put together a declaration to describe how that decision came

9    about.

10           THE COURT:  I think what I'm going to do -- you

11   can't cross-examine a declaration.  What I am going to do is

12   I'm going to direct that you locate the person, I presume there

13   is such a person who would be in a position to speak

14   authoritatively to the facts and circumstances surrounding the

15   closing.  Subject to everybody's availability, I'm presently

16   bringing my Deputy Clerk in and we're going to schedule a short

17   telephonic, for lack of a better term, it's going to be a

18   hearing where I'm going to ask the government to produce

19   testimony for the benefit or as to the reason or reasons for

20   the closure.  Mr. Devlin will have an opportunity to

21   cross-examine, and then I'll be able to make a finding on the

22   record on this point.  Because it strikes me as things

23   presently exist, it's just floating a bit in space.  Is that

24   something you can accomplish in relatively short order?

25           MR. GOLDRING:  Yes, your Honor.  When should we have

1　that witness available?

2　　　　　THE COURT:  As soon as my Deputy Clerk comes in,

3　I'll tell you.  I would propose Monday afternoon at 2:30.

4　　　　　MR. COLVILLE:  That works for me.

5　　　　　MR. GOLDRING:  That's fine.

6　　　　　THE COURT:  Mr. Devlin or Mr. Lanzillo will be

7　available for that?

8　　　　　MR. DEVLIN:  I will be out of town, I believe Mr.

9　Lanzillo will be available.

10　　　　　THE COURT:  As I said, limited to the issue I just

11　discussed, the facts an circumstances surrounding the closing

12　of that facility and the reasons for the closing of that

13　facility.  Thank you, very much.

14　　　　　MR. DEVLIN:  Your Honor, if I could raise one more

15　issue.  And it's a scheduling issue, I apologize for raising

16　it.  I just want to give the court as prompt notice as

17　possible.  With the dental claim, I understand the court hasn't

18　made any rulings.  In the event the magistrate judge's report

19　and recommendations are affirmed, thus the dental claim

20　survives and if we are unable to resolve the dental claim, I

21　did want to raise with the court this issue.  Attorney Lanzillo

22　and I, quite frankly, your Honor, are double booked that entire

23　week of the 19th.  We have a week long trial in Crawford

24　County, that the judge has been unwilling to move.  We had a

25　case, a jury trial, we're trying to find a way to make it work

1   with the personnel here.

2             THE COURT:  Which one got booked first?

3             MR. DEVLIN:  The original case in Crawford County

4   case was booked first.  The case has been booked probably for

5   about a year.

6             THE COURT:  Who is it before?

7             MR. DEVLIN:  It's before Judge Vardaro.

8             THE COURT:  Did you ask him?

9             MR. DEVLIN:  We have.  It's been moved twice by

10  other counsel, your Honor.

11            THE COURT:  I don't blame him for that.

12            MR. DEVLIN:  We believe, if the objections aren't

13  sustained, the remaining claim would be a bench trial.  And we

14  don't believe, although, I would obviously defer to Mr.

15  Colville, we don't believe it would take much more than one

16  day.  I was wondering if there's any possibility to move that a

17  week, since we would no longer be needed to go pick a jury.  I

18  would respectfully raise that issue with your Honor.

19            THE COURT:  Do you mean to move it to the 26th?

20            MR. DEVLIN:  Yes, your Honor.  Quite frankly, any

21  time outside the week of the 19th would be fine.

22            THE COURT:  We can do that.

23            MR. COLVILLE:  My only problem is I'm out of town.

24            THE COURT:  When?

25            MR. COLVILLE:  The 21st through the 28th.

1          THE COURT:  Put it this way, I try to make it habit

2    of not ruining people's travel plans.

3          MR. COLVILLE:  I'm more than willing to allow, if

4    all we're talking about is the tort claim on the dental claim,

5    I have no problem with Judge Baxter handling the matter.  If

6    that's the solution, I have no problem moving it to any other

7    day, any other day than the 21st through the 28th.

8          THE COURT:  Let's go of the record here.

9          (Discussion held off the record.)

10          THE COURT:  All right.  The court having de novo

11    reviewed the magistrate judge's report and recommendation

12    relative to the dental aspect of this case, I am adopting it as

13    the opinion of the court.  That's number one.  There will be a

14    written order to that effect.  Number two, I'm informed by Mr.

15    Colville that the government is willing to consent to the

16    jurisdiction of the magistrate judge for all further purposes

17    on the dental claim of Mr. Michael Hill.  That's fine.

18          MR. COLVILLE:  Just for the purpose only of the FTCA

19    portion of Michael Hill's claim.

20          THE COURT:  Only for the FTCA portion.  I presume

21    what will happen is the magistrate judge, if her time slot

22    permits, will probably have the pretrial conference scheduled

23    for Wednesday remain the same or she may change it, that's up

24    to her.  One thing we couldn't do, is you won't get taken to

25    trial either during the week that you have a problem, Mr.

1  Devlin, or during your travel time, Mr. Colville.

2          MR. COLVILLE:  Thank you, your Honor.

3          MR. DEVLIN:  Thank you, your Honor.

4          THE COURT:  Let me put you on hold for one second.

5          (Off the Record.)

6          THE COURT:  We're back.  I think that's pretty much

7  it.  Except to say I can guarantee you that somebody will be

8  contacting you from the magistrate judge's office.  I have

9  Cindy with me right now from Magistrate Judge Baxter's.  Mr.

10  Colville, did say you're back in the office on the 28th?

11          MR. COLVILLE:  I'm returning to Pittsburgh the 28th,

12  I'll be back in the office on the 29th.

13          THE COURT:  Let me throw out a couple other

14  potential dates here.  Assuming this thing goes to trial, do

15  you all agree this will be done in a day, kind of looks that

16  way to me?

17          MR. COLVILLE:  Two experts, and we would call the

18  doctor and maybe the two dental assistants.

19          MR. DEVLIN:  I believe, at least our expert is going

20  to be done by video, is that right, beforehand.

21          MR. COLVILLE:  Let me make sure we're all good with

22  that.  Presently, your Honor, Neal, I've scheduled the

23  videotaped deposition of our expert for Friday, March 16th,

24  assuming this case was going to trial on the 19th.  Depending

25  on what the court orders here, that may all change.  But I

1   wanted to make sure Neal is fine with that and Rich is fine

2   with that, given the fact we're going to trial that following

3   Monday.

4           THE COURT:  Let me ask you this.  Would you be able

5   to move the videotaped deposition of the expert to the 15th?

6           MR. COLVILLE:  No, I'm not able to, your Honor.

7           THE COURT:  In any event, it doesn't matter, once

8   it's in the can, it's in the can.  The magistrate judge can

9   play it without anybody there, I suppose.  All right.  I think

10  that's about all we can do today.

11          (Discussion held off the record.)

12

13          (Whereupon, at 11:44 a.m., the proceedings were

14  concluded.)

15

16                            -  -  -

17

18

19

20

21

22

23

24

25

1

C E R T I F I C A T E

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25